In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1439

Richard Goldwasser, et al.,
individually and on behalf of
all others similarly situated,

Plaintiffs-Appellants,

v.

Ameritech Corporation,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 6788--Charles P. Kocoras, Judge.


Argued March 30, 1999--Decided July 25, 2000


  Before Ripple, Diane P. Wood, and Evans, Circuit
Judges.

  Diane P. Wood, Circuit Judge.  The
Telecommunications Act of 1996, Pub. L. 104-104,
110 Stat. 56 (1996), codified at 47 U.S.C. sec.
151 et seq., represents a comprehensive effort by
Congress to bring the benefits of deregulation
and competition to all aspects of the
telecommunications market in the United States,
including especially local markets. But progress
and change in such a complex industry do not
occur overnight, and Congress accordingly
entrusted the Federal Communications Commission
(FCC) and the state public utility commissions
with the task of overseeing the transition from
the former regulatory regime to the Promised Land
where competition reigns, consumers have a wide
array of choice, and prices are low.

  The antitrust laws for more than 110 years have
served much the same purpose for the entire
economy. The question that confronts us here is
how and where these two competition-friendly
regimes intersect. Consumers in most of the
states served by Ameritech Corporation brought
this suit under the monopolization provision of
the Sherman Act, 15 U.S.C. sec. 2 (1994),
claiming that Ameritech has been violating both
the antitrust laws, as it has moved through the

deregulation process mandated by the Telecommunications Act (which we will usually call "the 1996 Act" for short), and the 1996 Act itself. The district court dismissed their case, never reaching their effort to bring it as a class action, on the ground that they lacked standing to complain about Ameritech's alleged footdragging and obstructive behavior. We have concluded that the district court was correct to dismiss the plaintiffs' suit. Our reasons, however, differ in important respects from those on which it relied, as we explain below.

I

Plaintiffs-appellants Richard Goldwasser, Michael Cohn, Eric Carter, and Richard Lozon are citizens of Illinois, Wisconsin, Indiana, and Michigan, respectively. Those states, plus Ohio (for which there mysteriously was no named class representative) are the five states in which defendant Ameritech provides local telephone service. The Goldwasser plaintiffs (which is what we will call them here) are consumers of local telephone services in Ameritech's area. When the 1996 Act was passed, they, like millions of other telephone customers throughout the country, looked forward to the same kind of development of competitive local services that had occurred several decades earlier in the telephone equipment, long distance, and enhanced services markets. When this did not occur as speedily as they had hoped, they concluded that the fault lay with Ameritech. Under the 1996 Act, Ameritech has special responsibilities as the incumbent local exchange carrier, or ILEC, to cooperate with potential entrants as they seek to break into the local services markets. Believing that Ameritech was flouting its obligations under the 1996 Act and unlawfully monopolizing under Section 2 of the Sherman Act, they filed the present suit as a class action on September 26, 1997.

A.

Before turning to the specifics of the Goldwasser complaint, it is helpful to review what the 1996 Act was designed to do and how it went about that task.

Voice telephony itself was born with the famous summons Alexander Graham Bell sent to his assistant Thomas A. Watson, on March 10, 1876: "Mr. Watson, come here; I want you." George P. Oslin, The Story of Telecommunications 219 (1992). Just a few days earlier, on March 7, 1876, Bell became the owner of the first patent for a recognizable telephone, Patent No. 174,465. After a considerable amount of litigation, certain patents for improvements to Bell's

original invention were upheld by the Supreme Court. See United States v. American Bell Telephone Co., 167 U.S. 224 (1897). Bell and his backers proved to be even more astute as businesspeople than they had been as inventors. They incorporated, and by 1886, a mere decade after the issuance of Bell's patent, the tree-like shape of the world-famous Bell Telephone company was beginning to be recognizable, with the American Telephone and Telegraph Company (AT&T) at its trunk. Oslin at 230.

Although the Bell company reigned supreme during the life of the basic patents, when the patents expired there was a burst of competition from many independent telephone companies around the country. This was, however, temporary: mergers and acquisitions led to re-consolidation, and by the time the Communications Act of 1934, ch. 652, 48 Stat. 1064 (1934) (codified as amended in scattered sections of 47 U.S.C.) (the 1934 Act), was passed, it was an article of faith that telephone service, like services furnished by other public utilities, was a natural monopoly. Consumer protection was to be achieved by regulation, which, insofar as it affected local service, took place at the state level. The FCC had responsibility for regulating interstate telephone companies and services.

By 1934, the Bell System included operating companies, long distance services, equipment manufacturing, and research facilities. AT&T owned 80% of all the local telephone lines and services in the United States, and it had a monopoly lock on long distance service. There matters stood for some four decades. But, even if the regulatory picture was static, technology and markets were not. The natural monopoly assumption came under increasing attack, especially as it pertained to long distance services and equipment manufacturing.

In 1974, the United States, through the Antitrust Division of the U.S. Department of Justice, sent shock waves through the nation when it instituted a massive antitrust case against AT&T. The complaint alleged that AT&T and its affiliates Western Electric Co. and Bell Telephone Laboratories had maintained an unlawful combination for many years among themselves and with the 22 Bell Operating Companies, or BOCs in telecom jargon; that they had restricted competition from other telecommunications systems and carriers, and from other manufacturers; and that they had engaged in a host of monopolistic practices. See [1970-1979 U.S. Antitrust Cases Transfer Binder] Trade Reg. Rep. (CCH) para. 45,074. Rather early in the litigation, the district judge who handled the proceedings from the date of filing until the case was wrapped up

after the passage of the 1996 Act, the Honorable Harold Greene, rejected the defendants' argument that the matters raised in the complaint fell within the exclusive jurisdiction of the FCC and were thus immune from antitrust scrutiny. See United States v. American Tel. & Tel. Co., 461 F. Supp. 1314, 1326-28 (D.D.C. 1978) (AT&T I). In that opinion, Judge Greene considered the question whether the communications statutes conferred an implied immunity from antitrust regulation on the defendants, and his answer was no. Both his decision in that case, and the eventual Modified Final Judgment (MFJ) that reflected the consent decree reached among the parties, rested on the simple notion that, despite the existence of a substantial network of regulation in the field, there was still plenty of room for competition. See United States v. American Tel. & Tel. Co., 552 F. Supp. 131 (D.D.C. 1982) (AT&T II), aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983). Where competition was possible, the defendants had no right to use their monopoly power to squelch it.

From the time when the consent decree was approved until the 1996 Act took effect, the process of opening up telecommunications markets to competition took place under the supervision of the district court, which had the task of administering the MFJ. Apart from its provisions requiring the break-up of the old Bell System, which was perhaps the most newsworthy consequence of the antitrust suit, the MFJ contained behavioral restrictions on the newly independent regional BOCs (including Ameritech) and on AT&T itself. See AT&T II, 552 F. Supp. at 226-28. These restrictions, which pertained to questions like the provision of long distance services outside local access and transport areas, the furnishing of wireless telephony, and the development of enhanced services, were designed to ensure that the former system (under which competition was distorted by leverage and cross-subsidization between protected, regulated markets and unregulated markets) did not reappear.

Long before the 1996 Act was passed, however, it had become clear that comprehensive regulation of the rapidly advancing telecommunications markets was not a task well suited to the federal courts. Thus, one of the first things Congress did in the 1996 Act was to shift the remaining authority the district court was exercising under the MFJ over to the FCC. The 1996 Act itself was designed to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications

technologies." Preamble to Telecommunications Act of 1996. As the Supreme Court acknowledged in AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999), and as we have already noted, the eventual hope is to transform the telecommunications market from a monopolistic, regulated one to a vibrant, competitive one.

Two sections of the 1996 Act are of central importance here: sec.sec. 251 and 252. They are both contained in Part II of the statute, which is entitled "Development of Competitive Markets." Section 251 sets out detailed rules that implement the general duty of telecommunications carriers (as established in the statute) to interconnect with one another's facilities and equipment. Each local exchange carrier, or LEC, has the duty to resell on reasonable and nondiscriminatory terms, to provide number portability to the extent technically feasible, to provide dialing parity to competing providers, to afford access to rights-of-way, and to establish reciprocal compensation arrangements for the transport and termination of telecommunications. 47 U.S.C. sec. 251(b).

Incumbent LECs, or ILECs, have additional duties under the statute, which are spelled out in sec. 251(c): they must negotiate in good faith to create the agreements necessary for fulfilling the subpart (b) duties; they must provide for "requesting telecommunications carriers" appropriate interconnections; they must provide unbundled access to network elements at any technically feasible point on just, reasonable and nondiscriminatory terms; they must offer to aspiring competitors at wholesale rates any services that they sell at retail; and they must give reasonable public notice of changes in their services that would affect others.

The 1996 Act contains specific language about its relation to the federal antitrust laws. Section 601(b)(1), found at 47 U.S.C.A. sec. 152 Historical and Statutory Notes, provides that ". . . nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." To similar effect, sec. 601(c)(1) states that "[t]his Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments."

B.

This is the background against which the Goldwasser plaintiffs filed their class action complaint. The complaint focuses tightly on the

ILECs' sec. 251 duties. It alleges that Ameritech controls more than 90% of the markets for local telephone service in the geographic territories it covers (basically, the five state-area) and that it has erected substantial barriers to entry into those markets. It also alleges that Ameritech controls a number of so-called essential facilities, including its telephone lines, equipment, transmission, and interconnection stations in the relevant markets. Ameritech's competitors (i.e. the companies from whom the plaintiff customers would like to purchase) are unable to duplicate those facilities. Ameritech, by engaging in a host of exclusionary practices made possible by its monopoly power, is preventing those competitors from entering the market.

The complaint specifies 20 specific exclusionary or monopolistic practices Ameritech has engaged in or continues to commit. We detail them here, because the nature of the complaint sheds significant light on the extent to which it implicates pure antitrust theory, the extent to which it focuses on local markets, and the extent to which it rests on the 1996 Act:

(1)  Ameritech is not providing the same quality of service to its competitors as it provides to itself, in violation of sec. 251.

(2)  Again in violation of sec. 251, Ameritech has not given its competitors nondiscriminatory access to its operational support systems, nor has it given them access to unbundled elements of its system on terms equivalent to those Ameritech enjoys.

(3)  Ameritech has failed to provide "dark fiber" as an unbundled network element, in violation of the 1996 Act.

(4)  Ameritech has failed to provide its competitors access to poles, ducts, conduits, and rights-of-way on a nondiscriminatory basis, in violation of sec.sec. 251 and 271.

(5)  Ameritech has failed fully to unbundle its network elements, including local loops, local transport, and local switching, in violation of sec. 251(c)(3).

(6)  Ameritech's competitors have experienced undue delays (presumably caused by Ameritech) in acquiring unbundled elements, and those delays have precluded them from offering services as attractive as Ameritech's.

(7)  The competitors have also experienced delays and discrimination as they have sought to

gain access to unbundled loops, in violation of sec. 251(c)(3).

(8)  Ameritech has failed to provide unbundled access to local transport interoffice transmission facilities on a nondiscriminatory basis, in violation of sec. 251(c)(3).

(9)  Ameritech has failed to provide local switching to competitors, in violation of sec. 271(c)(2)(B)(vi).

(10)  Ameritech discriminates against competitors by requiring competitive LECs and competitors to pay originating and terminating access charges, when it cannot collect interstate access charges.

(11)  Ameritech has failed to offer or provide customized routing, which is required to be provided as part of unbundled local switching.

(12)  Ameritech has not provided dialing parity to competitors for services such as operator assistance ("0"), directory assistance ("411"), and repairs ("611"), in violation of sec. 271(c)(2)(B)(xii).

(13)  Ameritech has failed to provide access to its own 911 and emergency services on a nondiscriminatory basis, in violation of sec. 271(c)(2)(B)(vii)(I).

(14)  Ameritech has continued to bill customers of competitors who have converted from Ameritech's services, and hence some customers are being double-billed, thereby harming the competitors' good will.

(15)  Ameritech has failed to provide interconnection between its network and those of competitors that is equal to the interconnections it gives itself, in violation of sec.sec. 251(c)(2) and 271(c)(2)(B)(i).

(16)  Ameritech has not complied with sec. 272(b)(3) of the 1996 Act, which requires a BOC and its interLATA affiliates to have separate officers, directors, and employees.

(17)  Ameritech has failed publicly to disclose all transactions with sec. 272 affiliates, in violation of sec. 272(b)(5).

(18)  Ameritech has refused to sell to its competitors, on just, reasonable, and nondiscriminatory terms, access to components of its network on an unbundled or individual basis.

(19)  Ameritech has refused to sell to its

competitors local telephone services at wholesale prices that are just, reasonable, and nondiscriminatory, which prevents the competitors in turn from offering attractive resale prices to consumers.

(20) Ameritech has refused to allow its competitors to connect with its local telephone network on just, reasonable, and nondiscriminatory terms.

All of these practices, the complaint alleges, violate both sec. 2 of the Sherman Act, 15 U.S.C. sec. 2, and the 1996 Act itself. The plaintiffs sought treble damages for the antitrust violations, as well as declaratory and injunctive relief.

C.

The district court dismissed the entire case under Rule 12(b)(6) for failure to state a claim. It found first that the filed rate doctrine, as developed in the line of cases beginning with Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156 (1922), barred the claims for damages under either the antitrust laws or the 1996 Act. The remainder of its discussion therefore pertained only to the plaintiffs' requests for injunctive relief. As to that, the court found that the plaintiffs lacked standing to sue under the antitrust laws, under the Supreme Court's decision in Block v. Community Nutrition Institute, 467 U.S. 340, 351-52 (1984) (no standing where a suit would severely disrupt a complex regulatory scheme). Last, it found that consumer plaintiffs were not entitled to sue to enforce the duties on ILECs created by the 1996 Act.

II
A.

We consider first the propriety of dismissing the Goldwasser plaintiffs' antitrust claims on a Rule 12(b)(6) motion. The plaintiffs see this as a straightforward application of Section 2: Ameritech is a monopolist; Ameritech is engaging in conduct designed to maintain its monopoly power, through a variety of exclusionary practices; and plaintiffs as consumers are harmed. See generally United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). As consumers and direct purchasers from Ameritech, they argue, they clearly have standing to bring this suit under decisions such as Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 539-41 (1983) (general definition of "person injured" within the meaning of Clayton Act sec. 4, 15

U.S.C. sec. 15) and Illinois Brick Co. v.
Illinois, 431 U.S. 720 (1977) (barring suits by
indirect purchasers). The 1996 Act contains an
antitrust savings provision, and that is the end
of the matter as far as they are concerned.
Neither the filed rate doctrine nor the fact that
the 1996 Act contains specific rules regulating
Ameritech should stand in their way of treble
damages and injunctive relief, on behalf of
themselves and the class they seek to represent.

We agree with the plaintiffs part of the way:
there is nothing in the rules of antitrust
standing that prevents them from suing. But, as
we will show, this case cannot survive as a pure
antitrust suit against Ameritech, freed from the
specific regulatory requirements Congress imposed
in the 1996 Act. Only if Section 2 somehow
incorporates the more particularized statutory
duties the 1996 Act has imposed on ILECs like
Ameritech would Ameritech's alleged failure to
comply with the 1996 Act be, in itself, also an
antitrust violation. In considering whether this
is so, we necessarily make an inquiry similar to
the one in Silver v. New York Stock Exchange, 373
U.S. 341 (1963), about the extent to which
antitrust rules apply in this industry and the
extent to which a different federal statute--the
1996 Act--provides the governing rules of law. If
that inquiry reveals a conflict between the
antitrust laws and the 1996 Act, we would need to
reach the question of implied immunity; if it
shows instead that the two laws are reconcilable,
immunity is beside the point. (This, we believe,
is what the district court was getting at too,
when it turned to Block to justify its dismissal
of the case; its misstep was to use the rhetoric
of standing.)

We begin this part of our inquiry with a brief
review of Sherman Act sec. 2, which is the
statute that makes it unlawful to monopolize, to
attempt to monopolize, or to conspire to
monopolize. The Supreme Court has had a number of
occasions on which to address the elements of a
Section 2 monopolization case, most recently in
Eastman Kodak Co. v. Image Technical Services,
Inc., 504 U.S. 451 (1992). There, quoting from
Grinnell, supra, the Court reviewed what it takes
to prove monopolization:

The offense of monopoly under sec. 2 of the
Sherman Act has two elements: (1) the possession
of monopoly power in the relevant market and (2)
the willful acquisition or maintenance of that
power as distinguished from growth or development
as a consequence of a superior product, business
acumen, or historic accident.

504 U.S. at 481, quoting Grinnell, 384 U.S. at

570-71.

Few would say that the first element is easily proved: it is exceedingly difficult to prove market power, or monopoly power, directly, and the conventional way of proving power by showing a given share of a properly defined relevant market can present vexing problems as well. But the first element is a snap compared to the second. To demonstrate unlawful acquisition of monopoly power may not be terribly difficult, especially if it was born from an unlawful merger or acquisition, fraud on the Patent Office, or some other visible misdeed. Proof of unlawful maintenance of monopoly power, in contrast, requires courts to make the most subtle of economic judgments about particular business practices. As the Supreme Court noted in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), unilateral conduct must be approached with the utmost caution, lest the law forbid desirable, robust competition:

It is not enough that a single firm appears to "restrain trade" unreasonably, for even a vigorous competitor may leave that impression. For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster. In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive competitor.

Id. at 767-68 (footnote omitted).

Thus, it is clear that merely being a monopolist does not violate Section 2. United States v. Aluminum Co. of America, 148 F.2d 416, 429 (2d Cir. 1945) ("size alone does not determine guilt; . . . there must be some 'exclusion' of competitors; . . . the growth must be something else than 'natural' or 'normal;' . . . there must be a 'wrongful intent,' or some other specific intent; or . . . some 'unduly' coercive means must be used"). See also Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 275 (2d Cir. 1979); United States v. New York Great Atlantic & Pacific Tea Co., 173 F.2d 79, 87 (7th Cir. 1949). It follows from this, as our court and others have pointed out from time to

time, that even a monopolist is entitled to compete; it need not lie down and play dead, as it watches the quality of its products deteriorate and its customers become disaffected. See, e.g., Olympia Equipment Leasing Co. v. Western Union Telegraph Co., 797 F.2d 370, 375 (7th Cir. 1986); Telex Corp. v. IBM, 510 F.2d 894, 927-28 (10th Cir. 1975).

Part of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal. When we are considering distribution chains, or vertical relationships, the doctrine of United States v. Colgate & Co., 250 U.S. 300 (1919), comes into play, under which the Court said (somewhat tautologically, unfortunately), "[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." Id. at 307. Tautologies or no, the Colgate right has received consistent support from the Supreme Court even for large firms, as one can see from more recent decisions such as NYNEX Corp. v. Discon, Inc., 525 U.S. 128 (1998), in which the Court rejected the application of the per se rule against group boycotts to the decision of one buyer to favor one supplier over another, even if the decision was not for a legitimate business reason. See also Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761 (1984) (reaffirming Colgate in terms).

In general, then, even a firm with significant market power has no duty to deal with certain suppliers or distributors, unless it can be shown that its decisions are part of a broader effort to maintain its monopoly power. What about duties to deal with competitors, either affirmatively or by refraining from actions that will exclude them from the market either by preventing entry or by forcing incumbents out? The Supreme Court encountered a competitor case in Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985). Although the Court ultimately found that the decision of Ski Company (a firm with monopoly power) actually to forgo cash revenues and efficient methods of doing business for the sole purpose of driving its rival out of the market amounted to a violation of Section 2, it was careful to explain the limits on its holding as well. "Ski Co.," it wrote, "is surely correct in submitting that even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor." 472 U.S. at 600. "The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's

cherished right to select his customers and his associates." Id. at 601.

This court's decision in Olympia Equipment Leasing is consistent with the recognition in Aspen Skiing that monopolists normally do not need affirmatively to help their competitors. Monopolists are just as entitled as other firms to choose efficient methods of doing business (which is not, recall, what the Ski Company was doing, and that was why the Court and the jury were able to spot its conduct for the exclusionary practice it was). See Olympia Equipment Leasing, 797 F.2d at 375; Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 929 (4th Cir. 1990); United States Football League v. National Football League, 842 F.2d 1335, 1360-61 (2d Cir. 1988).

With these principles in mind, we turn to the question whether the Goldwasser plaintiffs had standing under the antitrust laws to bring their suit. We conclude that the answer is yes, no matter which branch of antitrust standing doctrine one considers. First, as we noted above, the plaintiffs were direct purchasers from Ameritech, and their complaint asserts that a variety of practices in which Ameritech has engaged and is engaging in have led prices for those services to be anticompetitively high, in violation of Section 2. As direct purchasers, they have no Illinois Brick problem. As people forced to pay an alleged monopolistic overcharge, they have described the kind of injury the antitrust laws are designed to redress, which is to say they have satisfied the "antitrust injury" requirement of Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977). They are consumers, not shareholders, or unions, or others whose injury is too remote to satisfy Clayton Act sec. 4; thus, they have standing as the term is defined in Associated General Contractors, supra.

Finally, we think Ameritech is wrong to claim that the plaintiffs lack standing because they are attempting to raise third-party rights--the rights of the competitors. It is true that the reason the plaintiffs have been injured (allegedly, of course) implicates the rights of the competitors not to be excluded from the local markets through anticompetitive actions of Ameritech, but that does not make this a jus tertii case. These plaintiffs want lower prices and more choice, and they claim that Ameritech (a monopolist) is doing things to prevent that from happening. Their theory is a classic exclusionary acts theory, and in all such cases, the monopolist's alleged sin is the exclusion of other competitors from the market. One assumes that those other competitors are grateful for the help from the consumer litigation, but that is

incidental. The Goldwasser plaintiffs do not care in principle which competitors enter their markets; they just want a competitively structured local telephone market that will prevent Ameritech from inflicting antitrust injury on them. We are satisfied that they are asserting their own rights, and thus that they have standing.

Block, on which the district court relied, does not require a contrary conclusion. Indeed, Block did not even involve antitrust standing. The question there was instead whether ultimate consumers of dairy products were entitled to obtain judicial review of milk market orders issued by the Secretary of Agriculture under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. sec. 601 et seq. The consumer plaintiffs brought their suit under the Administrative Procedure Act, 5 U.S.C. sec. 701 et seq., but the Court found that Congress had created a different scheme for judicial review of marketing orders in the agricultural marketing legislation, which excluded the kind of consumer suit the plaintiffs wanted to bring.

Block may offer useful insight into the Goldwasser plaintiffs' case insofar as they are trying to assert rights directly under the 1996 Act, but we do not find it helpful for their antitrust case. Their problem in the antitrust case is not standing. It is the more fundamental question whether they have stated a Section 2 claim at all against Ameritech when they accuse it of failing to comply with its myriad duties under sec.sec. 251, 252, and 271 of the telecommunications law.

The fundamental fallacy in the plaintiffs' theory is that the duties the 1996 Act imposes on ILECs are coterminous with the duty of a monopolist to refrain from exclusionary practices. They are not. It would have been possible for Congress to have passed a statute that simply lifted the regulatory prohibitions found in sources such as the Telecommunications Act of 1934, the MFJ, and other sources, that barred companies in different parts of the telecommunications market (i.e. long distance and local markets, generally speaking) from entering one another's domains. Anyone who wanted to compete with an ILEC would have had the burden of duplicating its physical infrastructure or of persuading the ILEC to contract with it on mutually satisfactory terms, but this is the normal way in which competitive markets work. It obviously takes much longer to enter a market that requires huge sunk cost investments before business is possible, but the success of the companies that challenged AT&T's hegemony over

long distance shows that it can be done. We might think of this hypothetical legislative approach as one involving passive restrictions on the ILECs, under which they would have been permitted to compete, but they would have been prohibited from engaging in affirmatively exclusionary acts like the efforts of the Ski Company in Aspen Skiing, or the newspaper company in Lorain Journal Co. v. United States, 342 U.S. 143 (1951), or the shoe company in both United Shoe Machinery Corp. v. United States, 258 U.S. 451 (1922), and United States v. United Shoe Machinery Corp., 110 F. Supp. 295 (D. Mass. 1953), aff'd per curiam, 347 U.S. 521 (1954).

   In other words, Congress could have chosen a simple antitrust solution to the problem of restricted competition in local telephone markets. It did not. Instead, in an effort to jump-start the development of competitive local markets, it imposed a host of special duties on the ILECs; it entrusted supervision of those duties to the FCC and the state public utility commissions; and it created a system of negotiated agreements through which this would be accomplished. These are precisely the kinds of affirmative duties to help one's competitors that we have already noted do not exist under the unadorned antitrust laws. See Olympia Equipment Leasing Co., 797 F.2d at 375; MCI Communications Corp. v. AT & T, 708 F.2d 1081, 1149 (7th Cir. 1983); United States Football League, 842 F.2d at 1360-61; Catlin v. Washington Energy Co., 791 F.2d 1343, 1348-49 (9th Cir. 1986).
 It is not our task to assess the wisdom of the particular measures Congress thought would be helpful in that process. We have only to recognize that the duties to which plaintiffs refer in paragraphs (1) through (20) of their complaint, which we have set out earlier, go well beyond anything the antitrust laws would mandate on their own. A complaint like this one, which takes the form "X is a monopolist; X didn't help its competitors enter the market so that they could challenge its monopoly; the prices I must pay X are therefore still too high" does not state a claim under Section 2. The reason is because the antitrust laws do not impose that kind of affirmative duty, even on monopolists.

   To the extent such a duty exists, as the complaint itself makes clear, it comes from the 1996 Act. We think it both illogical and undesirable to equate a failure to comply with the 1996 Act with a failure to comply with the antitrust laws. It is illogical because there are countless laws that a firm with market power might violate that have little or nothing to do with its position in the market: an agricultural firm might fail to comply with safety or

cleanliness standards applicable to food processing; a computer processor firm might violate employment discrimination laws; a pharmaceutical firm might run afoul of the Food and Drug Administration's rules for approval of new drugs. Even if, in some indirect way, those defalcations helped the firm to maintain its monopoly, the link is too indirect to support an antitrust claim. Those other statutory regimes contain their own penalty structures, and that is the proper way to address any violations.

That leads to our other point, which is that it would be undesirable here to assume that a violation of a 1996 Act requirement automatically counts as exclusionary behavior for purposes of Sherman Act sec. 2. The 1996 Act in fact has an elaborate enforcement structure that Congress created for purposes of managing the transition from the former regulated world to the hoped-for competitive markets of the future. Questions concerning the duties of the ILECs, the state commissions, and competitors have been coming before the courts with regularity. See, e.g., MCI Telecommunications Corp. v. U.S. West Communications, 204 F.3d 1262 (9th Cir. 2000) (review of arbitrated agreement, including topics such as unbundling, co-location of remote switching units, and cost arrangements); AT&T Communications Systems v. Pacific Bell, 203 F.3d 1183 (9th Cir. 2000) (reviewing arbitrated agreement under which competitor sought entry into ILEC market); Alenco Communications, Inc. v. FCC, 201 F.3d 608 (5th Cir. 2000) (denying a host of petitions from local exchange carriers challenging FCC universal service obligation rules); GTE South, Inc. v. Morrison, 199 F.3d 733 (4th Cir. 1999) (upholding FCC's rules under the 1996 Act for setting prices for unbundled network elements and state commission's decision in an arbitration); Puerto Rico Telephone Co. v. Telecommunications Regulatory Board of Puerto Rico, 189 F.3d 1, 12-13 (1st Cir. 1999) (deciding among other things that review of state commission's actions under state law relating to interconnection was not possible under the 1996 Act); Texas Office of Public Utility Counsel v. FCC, 183 F.3d 393 (5th Cir. 1999) (evaluating claims pertaining to the universal service obligation that exists under the 1996 Act, upholding some parts of the FCC's orders and striking down others); BellSouth Corp. v. FCC, 162 F.3d 678 (D.C. Cir. 1998) (upholding 1996 Act restrictions on the BOCs' ability immediately to provide in-region long distance service); SBC Communications, Inc. v. FCC, 154 F.3d 226 (5th Cir. 1998) (upholding the special provisions of the 1996 Act directed toward the BOCs, relating to in-region long distance service, equipment manufacturing, and electronic publishing); and

BellSouth Corp. v. FCC, 144 F.3d 58 (D.C. Cir. 1998) (upholding provisions of 1996 Act that limit the ability of the BOCs to provide electronic publishing services). The antitrust laws would add nothing to the oversight already available under the 1996 law.

Our principal holding is thus not that the 1996 Act confers implied immunity on behavior that would otherwise violate the antitrust law. Such a conclusion would be troublesome at best given the antitrust savings clause in the statute. It is that the 1996 Act imposes duties on the ILECs that are not found in the antitrust laws. Those duties do not conflict with the antitrust laws either; they are simply more specific and far-reaching obligations that Congress believed would accelerate the development of competitive markets, consistently with universal service (which, we note, competitive markets would not necessarily assure).

The only question that remains under the antitrust part of the case is whether anything the plaintiffs have alleged can be divorced from its 1996 Act context such that it states a free-standing antitrust claim for Rule 12(b)(6) purposes. The plaintiffs have argued that they have such claims: they point to their allegations that Ameritech (a monopolist) controlled certain essential facilities and refused unreasonably to provide access for others to those facilities. They refer to the antitrust theory that began with United States v. Terminal Railroad Ass'n, 224 U.S. 383 (1912), and that the Supreme Court developed further in Associated Press v. United States, 326 U.S. 1 (1945).

It is true that paragraph 37 of the complaint asserts that Ameritech "dominates and controls an essential facility, which consists of its telephone lines, equipment, and transmission and interconnection stations in the relevant market," and paragraph 38 asserts that Ameritech's competitors are practically and reasonably unable to duplicate those essential facilities. The complaint also alleges that Ameritech has refused to deal with its competitors on just, reasonable, and nondiscriminatory terms. Nevertheless, when one reads the complaint as a whole these allegations appear to be inextricably linked to the claims under the 1996 Act. Even if they were not, such a conclusion would then force us to confront the question whether the procedures established under the 1996 Act for achieving competitive markets are compatible with the procedures that would be used to accomplish the same result under the antitrust laws. In our view, they are not. The elaborate system of negotiated agreements and enforcement established by the 1996 Act could be brushed aside by any

unsatisfied party with the simple act of filing an antitrust action. Court orders in those cases could easily conflict with the obligations the state commissions or the FCC imposes under the sec. 252 agreements. The 1996 Act is, in short, more specific legislation that must take precedence over the general antitrust laws, where the two are covering precisely the same field.

This is not the kind of question that requires further development of a factual record, either on summary judgment or at a trial. We therefore agree with the district court that it was proper for resolution under Rule 12(b)(6). There are many markets within the telecommunications industry that are already open to competition and that are not subject to the detailed regulatory regime we have been discussing; as to those, the antitrust savings clause makes it clear that antitrust suits may be brought today. At some appropriate point down the road, the FCC will undoubtedly find that local markets have also become sufficiently competitive that the transitional regulatory regime can be dismantled and the background antitrust laws can move to the fore. Our holding here is simply that this is not what Congress has mandated at this time for the ILEC duties that are the subject of the Goldwasser complaint. The district court thus correctly rejected the plaintiffs' antitrust theory.

B.

Plaintiffs still have another arrow in their quiver, which is their claim under the 1996 Act itself. No one ever suggested that they lacked standing to bring that action, and it obviously does not raise the problems of conflicting statutory schemes that the antitrust theory does. But they face a different problem here. The 1934 Act permits a lawsuit for damages to be brought by "[a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter," 47 U.S.C. sec. 207, and it makes carriers liable to such plaintiffs for "the full amount of damages sustained in consequence of any such violation," together with attorney's fees, 47 U.S.C. sec. 206. As consumers, however, their lawsuit for damages boils down to a claim for overcharges Ameritech has been able to impose upon them, as a result of its failure to carry out its responsibilities under the 1996 Act.

The district court concluded that the filed rate doctrine, which bars courts from re-examining the reasonableness of rates that have been filed with regulatory commissions, precluded this kind of consumer action. In Keogh, supra, the Supreme Court explained that the courts'

ability to determine the reasonableness of rates is limited; that awarding damages to plaintiffs while leaving less litigious customers paying the filed rates would be discriminatory; and that a damages assessment would necessarily require an independent rate-setting proceeding in which the court would have to guess what lower rate the agency should have chosen. 260 U.S. at 163-64. Although the doctrine had come under some criticism, the Supreme Court reaffirmed it in Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 424 (1986), and we are bound to follow it.

The Goldwasser plaintiffs argue that Ameritech's rates should not be shielded by the doctrine because, although the state public utility commissions nominally oversee its rate-setting, they rarely exercise their muscle and thus give no meaningful review to the rate structure. The Supreme Court rejected precisely this argument in Square D, 476 U.S. at 417 n.19, and this court did the same in In re Wheat Rail Freight Rate Antitrust Litigation, 759 F.2d 1305, 1313 (7th Cir. 1985). We reject it here again, but with the additional comment that the process established in sec. 252 of the 1996 Act for review of negotiated agreements, both for substance and for implementation, provides an extra safeguard against indolent agencies. Furthermore, the record thus far is one of active use of these review procedures; there would be no basis at all to find that they are illusory.

We thus agree with the district court that the plaintiffs cannot pursue their damages claim under the 1996 Act, because the monopoly claim these plaintiffs are trying to assert necessarily implicates the rates Ameritech is charging. To the extent they are seeking damages under the Sherman Act, the same analysis applies.

III

The judgment of the district court is AFFIRMED.