The **OHIO BELL TELEPHONE CO.**, Plaintiff,

v.

**CORECOMM NEWCO, INC.,**
**Defendant, Counterclaimant,**
**and Third–Party Plaintiff**

v.

**Ameritech Corp., et al., Third–**
**Party Defendant**

No. 1:01 CV 2057.

United States District Court,
N.D. Ohio,
Eastern Division.

July 25, 2002.

**MEMORANDUM OPINION**

NUGENT, District Judge.

This matter is before the Court on a Motion to Dismiss Counts II and III of Defendant's First Amended Counterclaim, filed on behalf of Plaintiff, The Ohio Bell Telephone Company and Third–Party Defendants, Ameritech Corporation, Ameritech Services, Inc., SBC Communications, Inc., SBC Operations, Inc., and SBC Services, Inc. (collectively "SBC" or "Counterdefendants"). The Counterdefendants have moved for a dismissal of CoreComm Newco, Inc.'s ("CoreComm") claim for maintenance of a monopoly under Section two of the Sherman Act, 15 U.S.C. § 2, and for fraudulent and negligent misrepresentation. After careful consideration of the pleadings and a review of all relevant statutes and cited authority, the Counterdefendants' Motion to Dismiss is denied.

## STANDARD OF REVIEW

On a motion brought under Fed. R.Civ.P. 12(b)(6), this Court's inquiry is limited to the content of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *See Chester County Intermediate Unit v. Pennsylvania Blue Shield,* 896 F.2d 808 (3rd Cir. 1990).

In evaluating a motion for dismissal under Rule 12(b)(6), the district court must "consider the pleadings and affidavits in a light most favorable to the [non-moving party]." *Jones v. City of Carlisle, Ky.,* 3 F.3d 945, 947 (6th Cir.1993) (quoting *Welsh v. Gibbs,* 631 F.2d 436, 439 (6th Cir.1980)). However, though construing the complaint in favor of the non-moving party, a trial court will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations. *See City of Heath, Ohio v. Ashland Oil, Inc.,* 834 F.Supp. 971, 975 (S.D.Ohio 1993).

This Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In deciding a Rule 12(b)(6) motion, this Court must determine not whether the complaining party will prevail in the matter but whether it is entitled to offer evidence to support the claims made in its complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

■ If materials outside the pleadings have been attached to a motion to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6) this court has two options. First, the court may exclude the additional material and decide the matter based upon the complaint alone. Second, the court can treat the motion as one for summary judgment and dispose of it as provided in FED. R.CIV.P. 56. *Carr v. Armstrong Air Conditioning, Inc.*, 817 F.Supp. 54, 55 (N.D.Ohio 1993); FED.R.CIV.P. 12(b)(6). In this case, the Court will treat the motion as a true motion to dismiss limited to the allegations and facts set forth in the counterclaim.

### FACTUAL AND LEGAL OVERVIEW [1]

CoreComm competes with SBC to provide local telephone services (including exchange access, Internet access, facsimile transmissions, data transmissions, caller I.D. services, call waiting, call forwarding, voicemail and other services) to residential and business customers in greater Cleveland and greater Columbus. SBC allegedly serves about 95 percent of residential consumers and 90 percent of the business customers, in these areas.

SBC controls the "last mile" of telephone infrastructure connecting individual customers to the rest of the telephone network, as well as other forms of infrastructure necessary for the provision of local telephone service in greater Cleveland and greater Columbus. Duplication of this infrastructure is alleged to be prohibitively expensive for companies wishing to break into the local phone service business, though CoreComm does admit that over time SBC competitors could acquire their own facilities and could profitably develop alternatives to significant segments of this local infrastructure. Access to this infrastructure is allegedly essential to any company wishing to compete in the provision of local exchange service and exchange access services.

In November of 1997, SBC Ameritech Ohio ("SBC") [2] and OCOM Corporation ("OCOM") entered into a contract whereby SBC was to provide a variety of services to OCOM. OCOM assigned its interests under the Contract to CoreComm in June of 1998. The contract obligates SBC to (1) provide CoreComm with access to SBC's network elements, including provisioning, pricing, billing, maintenance and performance standards for such access; (2) provide CoreComm with services for resale; (3) provide CoreComm with collocation, including pricing, billing and performance standards for collocation; and (4) provide CoreComm with promotional discounts for certain services. The contract further defines performance measurements and standards and sets time frames within which certain services are to be performed.

---

1. The facts as stated in this Memorandum and Order are taken from Defendant's Counterclaim and should not be construed as findings of this Court. In a motion to dismiss, the Court is obligated, for the purposes of that motion, to accept as true the facts set forth by the non-moving party, in this case, the Defendant.

2. SBC Ameritech Ohio is a trade name under which The Ohio Bell Telephone Company conducts its business.

There have been a multitude of disputes relating to the parties' duties and performance under the contract since it was implemented in 1998. The parties have communicated extensively about the disputes and have attended mediation through the Public Utilities Commission of Ohio's ("PUCO") dispute resolution program. In July of 2001, in an attempt to collect monies allegedly owed by Core-Comm under the Contract, SBC filed a complaint with the PUCO and shortly thereafter filed a complaint in the Court of Common Pleas in Cuyahoga County, Ohio. CoreComm had the common pleas court complaint removed to this Court, and SBC then amended its Complaint to consolidate the claims it brought in both the Common Pleas case and the PUCO case into a single action.

According to CoreComm's counterclaim, SBC has failed to live up to the terms of the Contract; imposed unreasonable fees for its services; charged for services not properly administered; provided faulty service and support; provided inaccurate billing; overcharged competitors; caused customers to be unnecessarily without service for extended periods of time if they chose to switch from SBC to CoreComm; and erroneously rejected, limited, and delayed service and customer change orders. CoreComm alleges that none of these quality and service issues arise with SBC's direct customers, but appear only in connection with the wholesale services provided to SBC's competitors and their customers. More than seventeen companies who attempted to compete with SBC have filed for bankruptcy, allegedly as a result of SBC's discriminatory and improper handling of those companies' service and access agreements.

CoreComm further alleges that SBC has denied CoreComm access to its shared transport network preventing it from being able to route inter LATA[3] toll traffic and, therefore, requiring it to toll traffic through third-party interexchange carriers, which is more expensive and limits the scope of CoreComm's local coverage. Despite having agreed to provide such access, SBC has argued that the denial is warranted before the PUCO and before the Federal Communications Commission ("FCC"). All of these failures, delays and hurdles are alleged to have intentionally raised CoreComm's and other competitors' costs to a point where they cannot effectively compete, and to have intentionally interfered with CoreComm's customer relations. The Counterclaim also sets forth other allegedly anti-competitive behavior of SBC.

In addition to its claims of anti-competitive behavior CoreComm claims that SBC made fraudulent or negligent misrepresentations upon which CoreComm relied to its detriment. Primarily these representations centered around SBC's assurances that it could, without disrupting customer service, convert CoreComm customers' service from resale to an arrangement called UNE–P. UNE–P is a form of service that would allow CoreComm to provide service using a combination of elements in SBC's network and without need of its own facilities, but at a lesser cost than pure resale. SBC and CoreComm contracted for a UNE–P service arrangement in 1998. CoreComm first considered converting customers to UNE–P service in 1999 but did not go forward with this plan because it knew it would have to pay a large conversion charge and it "knew that Counterdefendants were not prepared to provide a technically workable UNE–P

**3.** CoreComm explains that a LATA is a geographic market section that was established when AT & T was broken up. There are six LATA's in Ohio.

product." In 2001 SBC informed Core-Comm that it was ready to convert to UNE–P, however CoreComm alleges that SBC had never tested the transfer process in Ohio and as a result virtually ever customer who made the conversion lost some or all of its service in the process.

CoreComm alleges that SBC knew or should have known that it was incapable of performing an efficient conversion, and that SBC had the ability to make effective conversions had it wanted to do so. When, despite its apparent inability to perform the service, SBC nonetheless misrepresented to CoreComm that it was ready and able to make the conversions, CoreComm relied on these representations and allowed thousands of customers to convert. CoreComm allegedly suffered loss of clients and goodwill due to the poor implementation of the conversions.

## ANALYSIS

I. *Count Two: Illegal Monopoly in Violation of Section 2 of the Sherman Act*

SBC contends that this case is a simple contract action and that CoreComm's claim for monopolization should fail because it rests solely on the allegation that SBC did not "more actively help[ ] Core-Comm to compete less expensively and more efficiently than it already does for telecommunications customers in Ohio." According to SBC any affirmative duty to aid competitors in the telecommunications industry stems from either a contractual responsibility or a duty imposed by the Telecommunications Act of 1996, not from any antitrust law.

SBC is correct that many of the complaints set forth in CoreComm's Counterclaims stem from violations of the Interconnection Agreement and are, therefore, subject to the provisions of the The Telecommunications Act of 1996 ("Telecommunications Act"). Sections 251 and 252 of the Telecommunications Act impose cooperative duties which are incorporated into a interconnection agreement between the incumbent local exchange carriers and their new competitiors. The Telecommunications Act requires incumbents to provide services for resale with reasonable pricing and without unreasonable limitations. TCA § 251(b). The Telecommunications Act also requires incumbents to negotiate in good faith with new competitors to establish terms under which the competitors will be allowed to access the incumbents services and facilities. Negotiated terms must be submitted to the state public utilities commission for review and approval. TCA § 252(a), (e). The commission will also mediate disputes arising in the negotiations, and arbitrate any impasses. TCA § 252(a)(2), (b)(1). Any disputes not resolved through arbitration may be reviewed in a federal district court. TCA § 252(e)(6).

CoreComm, however, has articulated claims not only for breach of the Interconnection Agreement and violation of the Telecommunications Act, but has further alleged that SBC's actions and failures to act violate Section two of the Sherman Antitrust Act, 15 U.S.C. § 2. SBC argues that actions which violate the Telecommunications Act, or breach an interconnection agreement cannot be the basis for an antitrust claim under the Sherman Act. Courts across the country appear to be split in their approach to this question.

SBC relies heavily on the *Goldwasser* decision out of the Seventh Circuit. In *Goldwasser v. Ameritech Corporation,* 222 F.3d 390 (7th Cir.2000), the Court of Appeals dismissed a consumer claim for a violation of the Sherman Antitrust Act § 2. The *Goldwasser* Court reviewed the history of telecommunications regulation, including the Telecommunications Act, and

reviewed the antitrust case law which generally does not impose upon a monopolist any duty to assist or even deal with its competitors. The court held that "[o]nly if Section 2 [of the Sherman Act] somehow incorporates the more particularized statutory duties the 1996 Act has imposed on ILECs like Ameritech would Ameritech's alleged failure to comply with the 1996 Act be, in itself, also an antitrust violation." So far as it goes, this is a correct statement, however, it does not follow, as the *Goldwasser* decision seems to imply, that *no* Telecommunications Act violations can constitute antitrust violations.

■ While not every violation of the Telecommunications Act and resulting interconnection agreements can be the basis for an antitrust claim, it is possible, that some actions, such as a failure to provide access to essential facilities on reasonable and non-discriminatory terms, could violate both the Telecommunications Act (through violations of an interconnection agreement) and the Federal Antitrust laws. *See generally, Southern Pacific Communications v. AT & T,* 740 F.2d 980, 238 U.S.App. D.C. 309 (D.C.Cir.1984)(stating that the antitrust laws prohibit unreasonable and discriminatory restrictions on access to essential facilities) (citations omitted). Although, as the *Goldwasser* court noted, the duties imposed on incumbent providers by the Telecommunications Act are not "coterminous with the duty of a monopolist to refrain from exclusionary practices," neither are those duties mutually exclusive. *Cf. Goldwasser,* 222 F.3d at 399; *Law Offices Of Curtis v. Trinko, LLP v. Bell Atlantic Corporation,* 294 F.3d 307, 314 (2nd Cir.2002).

The *Goldwasser* court based its decision on the maxim that more specific legislation should take precedence over the general laws, where the two are covering precisely the same field. *Id.* at 401. However, as many courts have noted, "this principle does not apply if the legislature intended the general act to retain independent force." *See, e.g., Watson v. Fraternal Order of Eagles,* 915 F.2d 235 (6th Cir.1990). The Historical and Statutory Notes of the Telecommunications Act explicitly state that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." 47 U.S.C.A. § 152, Applicability of Consent Decrees and Other Laws (b)(1). Similarly, Section 601(c)(1) states that "this Act and the amendments made by this Act shall not be construed to modify, impair, or supercede Federal, State, or local law unless expressly so provided in such Act or amendments." 47 U.S.C.A. § 601(c)(1). Thus, Congress has clearly expressed its intention that the Telecommunications Act was not to interfere in any way with the application of the antitrust laws. Therefore, if an act or failure to act constituted an antitrust violation prior to the enactment of the Telecommunications Act, it should still constitute a violation of the antitrust laws following the enactment. If an act or failure to act did not constitute a violation of the antitrust laws prior to the enactment of the Telecommunications Act, it still does not constitute a violation of the antitrust laws, though it may form the basis for a claim under the Act itself.[4]

■ When there are two legislative acts addressing the same subject, and Congress does not provide a clear and manifest in-

4. The parties also included a clause in their Interconnection Agreement in which they agreed that "no remedy under this Agreement is intended to be exclusive and each and every remedy shall be cumulative and in addition to any other rights or remedies now or hereafter existing under applicable law or otherwise." Interconnection Agreement § 26.6.

tent to repeal one of them, "the rule is to give effect to both if possible." *Mancari*, 417 U.S. at 550–551, 94 S.Ct. 2474. The Supreme Court has also long noted that "repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973)(quoting *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–351, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)).[5] Here, both the Telecommunications Act and the Sherman Act set forth responsibilities for monopolists.. The two acts have different scope, different remedies, and different procedural requirements, yet they are complimentary in purpose. These acts are clearly not repugnant, and it is possible to give effect to both. Thus, in order to determine whether the Plaintiff's motion to dismiss Count Two of the Amended Counterclaim should be granted, this Court should evaluate the Counterclaim to see if it would state a claim for a violation of Section two of the Sherman Act if the Interconnection Agreement and the Telecommunications Act did not exist.

■ Generally a plaintiff can establish a violation of Section 2 of the Sherman Act by proving two elements "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." *Volvo N. Am. Corp. v. Men's Inter. Prof'l Tennis*

*Council,* 857 F.2d 55, 73 (2d Cir.1988) (citations omitted). CoreComm has clearly alleged facts that, taken in the light most favorable to it, would support a claim that SBC has monopoly power in an identified market. Therefore, the only question is whether it has stated a claim that SBC has willfully maintained or attempted to maintain that monopoly power by a means other than its actual superiority in product, service, and business development.

■ A monopolist generally has no duty to cooperate with its competitors, however, "[a] monopolist may not, of course, use its market power, whether obtained lawfully or not, to prevent or impede competition in the relevant market" *United States Football League v. National Football League,* 842 F.2d 1335, 1360–61 (2d Cir.1988) (citations omitted). The Supreme Court has explained that

> the absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances.... The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

■ A monopolist has a duty to provide competitors with reasonable access to "essential facilities" which are facilities that are essential to effective competition

---

**5.** Prior to the 1996 Telecommunications Act, it was well settled that there was no repugnancy between the antitrust laws and the regulatory scheme that was then applicable to the telecommunications industry. *See Southern Pac. Communications Co. v. AT & T,* 740 F.2d 980, 999–1000(D.C.Cir.1984) (citations

omitted). While the 1996 Telecommunications Act added additional requirements, both the 1996 Act and the prior regulatory scheme subjected rates or tariffs, and other conditions for interconnections and other access to local distribution facilities to FCC approval. *Id.*

and are under the control of the monopolist. *See Southern Pac. Communications Co. v. AT & T,* 740 F.2d at 1009. Under the antitrust laws, those in possession of essential facilities "must allow them to be shared on fair terms," *Directory Sales Management Corp. v. Ohio Bell Tel. Co.,* 833 F.2d 606, 612 (6th Cir.1987), unless "such sharing would be impractical or would inhibit [their] ability to serve [their] customers adequately." *Hecht v. Pro–Football, Inc.,* 570 F.2d 982, 992–993 (D.C.Cir.1977).

■ The elements necessary to establish an essentials facility claim are: (1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitors; and (4) the feasibility of providing the facility. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 748 (3d Cir.1996). Access to essential facilities must be provided "upon such just and reasonable terms and regulations as will, in respect of use, character and cost of service, place every [competitor] upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies." *Southern Pac. Communications Co.,* 740 F.2d at 1009(quoting *United States v. Terminal R.R.Assoc.,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810, (1912)).

■ CoreComm has alleged (1) that SBC is a monopolist, (2) that SBC has control of allegedly "essential facilities;" (3) that SBC has in some cases outright denied CoreComm access to such facilities,

and in others cases has denied access under just and reasonable terms; and (4) that it is feasible for SBC to provide just and reasonable access to the facilities in question. Although SBC may eventually be able to show that the facilities in question are not essential, that access was provided under just and reasonable terms, or that it was somehow infeasible to provide such access, these defenses are issues of fact which cannot be decided on a 12(b)(6) motion to dismiss.

■ CoreComm argues that its Counterclaim also alleges other anti-competitive activities that could form the basis for a violation of Section two of the Sherman Act including, disruption of CoreComm operations, price-quality squeeze, sham litigation, and a general failure to deal. While these each state a potential means of violating Section two, they are not discreet claims in the Counterclaim. Therefore, having found that a claim has been stated under Section two, the Court need not pass on the validity of each of these individual allegations. Nonetheless, it is doubtful that these alleged activities would support an antitrust claim in the absence of an essential facilities violation in this case.[6] The charges of disruption of Core-Comm operations, general refusal to deal, and price-quality squeeze are all premised on the same allegations that support the essential facilities claim. If the facilities at issue are not essential to competition, then SBC has no duty to deal with CoreComm reasonably or unreasonably, or to provide any particular level of quality, service or pricing under the antitrust laws.[7] Any

---

**6.** It is possible that although these activities don't state independent antitrust claims in the context of this case, they could be additional evidence of SBC's alleged intent to maintain its monopoly.

**7.** An exception to the general rule that competitors, outside of an essential facilities

claim, have no duty to assist or even deal with their competitors was established in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). This exception, however, does not apply under the facts set forth in the Counterclaim. In *Aspen,* the competitors had a previ-

violation of a duty arising solely from the Telecommunications Act or the Interconnection Agreement, does not state a claim under the antitrust laws.

As neither side has been able to cite to a case in which a charge of "sham litigation" was upheld where the complaining party actually initiated the proceedings complained of, this Court would not find that a the sham litigation charge states a claim for a Sherman Act Section two violation under these circumstances. CoreComm's grievance on this matter is really that SBC violated its contract, causing CoreComm to have to sue, which is a different type of harm than CoreComm would have suffered if SBC, itself, initiated fraudulent proceedings thus using the governmental process as an affirmative anticompetitive weapon. To hold otherwise would be to create a potential cause of action for "sham litigation" against any defendant who intentionally breached a contract or otherwise acted in a manner which allowed them to be sued. As for claims that SBC intentionally and baselessly prolonged litigation, CoreComm, itself, pointed out, there are other remedies, including Rule 11 sanctions, for baseless motions filed by SBC within a procedure initiated by CoreComm.

 Although CoreComm has stated a claim for a violation of Section two of the Sherman Act, this does not mean that the claim will be successful. In order to prevail, or indeed to defeat any possible summary judgment motions that may be filed after further factual development, CoreComm will have to produce evidence proving that the facilities it has been denied are indeed essential to competition. Denial of fair access to non-essential facilities,

and the provision of inferior quality or service, no matter how unreasonable, would not equal a violation of the antitrust laws under these circumstances.

## II. *Count Three: Fraudulent or Negligent Misrepresentation*

 SBC asserts that CoreComm's claim for fraudulent or negligent misrepresentation is in reality a breach of contract claim alleging only economic loss, and that this count is, therefore, barred by the economic loss doctrine. The economic loss doctrine prevents a party from suing in tort when the only duty breached is a contractual duty and the only damages claimed are direct or indirect economic losses due to the breach. *See Picker Int'l, Inc. v. Mayo Foundation*, 6 F.Supp.2d 685, 689 (N.D.Ohio 1998). The doctrine applies only if the claimant does not allege a "separate and unique duty not created by contract which would exist even in the absence of a contract." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 150, 684 N.E.2d 1261 (1996).

SBC and CoreComm contracted for a UNE–P service arrangement in 1998. CoreComm first considered converting customers to UNE–P service in 1999 but did not go forward with this plan because it knew it would have to pay a large conversion charge and it "knew that Counterdefendants were not prepared to provide a technically workable UNE–P product." In 2001 SBC informed CoreComm that it was ready to convert to UNE–P, however CoreComm alleges that SBC had never tested the transfer process in Ohio and as a result virtually every customer who made

ous history of voluntary cooperation in a joint marketing venture that had proven profitable for both parties. In this case, there is no history of prior cooperation, and no allegation that SBC's cooperation with CoreComm

would be profitable for SBC. The only basis alleged for any agreement or cooperation between SBC and CoreComm has been forced through regulation.

the conversion lost some or all of its service in the process. CoreComm further alleges that SBC knew or should have known at the time it made this representation that it was false, and that CoreComm would rely on it.

The Court has not been provided with a copy of the provisions of the contract relating to the UNE–P service agreement. It is possible that the claims alleged may be addressed by the contract language, which could then prevent CoreComm from recovering economic damages under a theory of misrepresentation. However, without proof that the issues allegedly misrepresented were part of the contractual terms, CoreComm has stated a claim for negligent or fraudulent misrepresentation. The contractual duties alleged in the Counterclaim apply to CoreComm's claims that UNE–P service was not timely provided and that it was not provided pursuant to the contractual terms. However, Core-Comm has stated a separate allegation that, regardless of SBC's contractual promises, CoreComm withheld its requests for transfer to UNE–P service for nearly three years because it knew SBC was not prepared to effectuate those changes. When SBC affirmatively represented (outside of the contractual promises) that it was indeed ready to make the changes, CoreComm relied on that representation, and began requesting UNE–P service changes. The harm CoreComm seeks to recover, according to the Counterclaim, is the harm resulting from making those changes before SBC was prepared to handle them, not the harm from waiting additional years for SBC to become ready. The latter is a contractual claim, the prior is a claim based on a general duty to avoid

negligently or intentionally misrepresenting facts upon which another party can be expected to rely.

Thus, though it is possible that the facts will not bear out the claim, or that contractual provisions not yet known to the court actually govern SBC's representations of readiness, at this stage CoreComm has stated a claim for negligent or fraudulent misrepresentation.[8] Counterdefendants' Motion to Dismiss Count Three is, therefore, denied.

### CONCLUSION

For the reasons set forth above. Plaintiff and Third–Party Defendants' Motion to Dismiss Counts Two and Three of Defendant's First Amended Counterclaim are hereby DENIED.

IT IS SO ORDERED.

---

**8.** None of the cases cited by SBC in support of its motion to dismiss addressed a 12(b)(6) motion to dismiss. Though in the cited cases, the facts did not bear out a distinction between the contract claims at issue and the additional misrepresentation claims, these cases were decided at the summary judgment stage or later after there had been more opportunity for factual development of the claims.