MGC COMMUNICATIONS, INC., d/b/a MPower Communications Corp., a Nevada corporation, Plaintiff,

v.

BELLSOUTH TELECOMMUNICA-TIONS, INC., a Georgia corporation, Defendant.

No. 00–2808–CIV.

United States District Court, S.D. Florida.

May 17, 2001.

Harley S. Tropin, Adam M. Moskowitz, Kozyak Tropin & Throckmorton, P.A., Miami, FL, Ronald S. Katz, Victoria E. Brient, William N. Hebert, Coudert Brothers, San Francisco, CA, Kent Heyman, John G. Kerkorian, Atlanta, GA, for MGC Communications, Inc.

William F. Hamilton, Steven L. Brannock, G. Calvin Hayes, Holland & Knight LLP, Tampa, FL, John W. Campbell, Holland & Knight, Miami, FL, J. Henry Walker, T. Michael Twomey, Marc W.F. Galonsky, Atlanta, GA, for BellSouth Telecommunications, Inc.

### *ORDER GRANTING DEFENDANT BELLSOUTH'S MOTION TO DISMISS*

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendant's Motion to Dismiss [D.E. 10], filed on September 8, 2000. Plaintiff filed a Response [D.E. 21] on October 20, 2000, and Defendant filed a Reply [D.E. 28] on November 9, 2000.

The Complaint, filed on August 2, 2000, alleges violations of the United States anti-

trust laws and the Telecommunications Act of 1996. The Complaint contains three claims for relief, as follows: (1) monopolization of high-speed internet access, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; (2) attempted monopolization of high-speed internet access, in violation of Section 2 the Sherman Antitrust Act, 15 U.S.C. § 2; and (3) failure to obey the FCC's *UNE Remand Order*,[1] in violation of 47 U.S.C. § 401(b). Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1337 and under 47 U.S.C. §§ 207, 251, 252 and 401(b).

Defendant moves for dismissal of all counts of the Complaint pursuant to Rules 12(b)(1) (lack of subject matter jurisdiction), (3) (improper venue), and (6) (failure to state a claim upon which relief may be granted), of the Federal Rules of Civil Procedure. After careful consideration of the parties' arguments, the applicable law, and the record as a whole, the Court concludes that Defendant's Motion to Dismiss should be granted.

## I. Background

### A. The Statutory Framework

In 1996, Congress passed the Telecommunications Act of 1996, Pub.L. 104–104, 110 Stat. 56 (1996), codified at 47 U.S.C. § 151, *et seq.*, to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Preamble to Telecommunications Act of 1996. The Act imposes on local carriers, as a matter of federal law, various duties designed to foster competi-

tion, and allows state commissions the option of taking a major role in implementing the Act's requirements.

Specifically, Section 251 of the Telecommunications Act stipulates that each local exchange carrier, or LEC, has the duty to resell on reasonable and nondiscriminatory terms, to provide number portability to the extent technically feasible, to provide dialing parity to competing providers, to afford access to rights-of-way, and to establish reciprocal compensation arrangements for the transport and termination of telecommunications. 47 U.S.C. § 251(b). Incumbent local exchange carriers, or ILECs, have additional duties under the statute, which are spelled out in § 251(c): they must negotiate in good faith to create the agreements necessary for fulfilling the subpart (b) duties; they must provide for "requesting communications carriers" appropriate interconnections; they must provide unbundled access to network elements at any technically feasible point on just, reasonable, and nondiscriminatory terms; they must offer to aspiring competitors at wholesale rates any services that they sell at retail; and they must give reasonable public notice of changes in their services that would affect others. *See also Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 394 (7th Cir.2000).

As noted above, incumbent local exchange carriers, or ILECs, and competitive local exchange carriers, or CLECs, must attempt to negotiate the terms of interconnection and resale. 47 U.S.C. § 251(c)(1) and 252(a). If the parties cannot reach an agreement, any party may request arbitration, and the parties are required to participate. 47 U.S.C. § 252(b)(1) and (5). All interconnection agreements adopted by negotiation or ar-

---

1. The *UNE Remand Order* is attached as Exhibit 1 to Defendant's Appendix in Support of Motion to Dismiss.

bitration must be submitted for approval to the State public service commission ("PSC"). 47 U.S.C. § 252(e). Parties may appeal any state PSC decision under the Telecommunications Act to federal district court. 47 U.S.C. § 252(e)(6).

The 1996 Act contains a 'savings clause' with respect to its relation to federal antitrust laws. Section 601(b)(1), found at 47 U.S.C. § 152 Historical and Statutory Notes, provides that, "... nothing in this Act or the amendments made by this Act ... shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." A similar provision is set forth with respect to federal, state, and local law. *See* § 601(c)(1) of the Act, 47 U.S.C. § 152 Historical and Statutory Notes ("This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.").

### B. The Case at Bar

In this case, Defendant BellSouth Telecommunications, Inc. ("BellSouth"), provides voice and data services in southern Florida as the incumbent local exchange carrier, or ILEC. Plaintiff MGC Communications, Inc. d/b/a Mpower Communications Corp. ("Mpower"), also provides local and long distance voice and data services, and operates as a competitive local exchange carrier, or CLEC, in Florida.

Mpower, as a facilities-based CLEC, has attempted to enter the Florida market by interconnecting and purchasing and/or leasing individual pieces of the ILEC network known as unbundled network elements ("UNEs"). In other words, Mpower builds and operates its own switching and other telecommunications equipment and leases or buys from the ILEC (e.g., BellSouth) the copper wire or "loop" that runs from a customer premises to the point of connection of the ILEC's Central Office. A Central Office typically serves approximately 35,000 end-users of telecommunications service. In the ILEC Central Office, the CLEC, such as Mpower, collocates equipment that recognizes the source of the incoming call, identifies where it needs to go, and sends it to its ultimate destination, be it local or long distance. Equipment records the source, nature, and destination of each call for purposes of permitting the ILECs, CLECs, and long-distance carriers to charge the customer, and in certain circumstances the other carrier, for providing the various originating, transport, and terminating functions of the call. *See* Complaint, ¶ 8.

Mpower and BellSouth first entered into an interconnection agreement in 1998. Upon expiration of this agreement, a second interconnection agreement was entered on June 21, 2000. *See* Complaint, ¶ 9.

In the past, BellSouth has provided high-speed data services to its business customers through the provisioning of T–1 dedicated lines, which cost a significant amount for the customer (e.g., as high as $1000/month). *See* Complaint, ¶ 10. Mpower purchases transmission facilities, which are called "unbundled loops," from BellSouth for the purpose of providing high-speed internet access through a Digital Subscriber Line ("DSL"). *See* Complaint, ¶ 11. Although DSL are presently marketed at a variety of costs, and in some instances as low as $49.95, Mpower contends that its DSL competes directly with BellSouth's T–1 business. *See* Complaint, ¶ 12. Mpower believes that in response to its roll-out of DSL services, BellSouth began to provide the DSL alternative to its T–1 business, and now competes directly with Mpower and other CLECs for DSL business. *See* Complaint, ¶ 12.

To provision DSL, Mpower must obtain "clean" or "conditioned" copper loops from

BellSouth, and it pays BellSouth a fee to remove items from the lines that interfere with the digital transmission. *See* Complaint, ¶ 16. One of the first steps in conditioning the copper loops is to obtain loop make-up information that details the technical characteristics of a particular loop. Currently, to obtain this information, Mpower is required to send a Service Inquiry to BellSouth's Complex Retail Support Group to assess the availability of DSL facilities. *See* Complaint, ¶ 17. BellSouth sends the request to its Service Advocate Center, which interprets information from a computerized database, called "LFACS," that contains Loop Facility Assignment Information, and determines the best available loop. The Service Advocate Center then sends the response back to the Complex Retail Support Group, which then sends an e-mail to Mpower advising of the loop make up of the loop that was determined to be DSL capable. The process is entirely manual and takes seven business days, plus additional time if conditioning is required. Furthermore, the manual nature of the process has resulted in numerous errors, which results in further delays, lost customers, and damage to Mpower's reputation. *See* Complaint, ¶ 18.

In contrast to the Service Inquiry process that Mpower is forced to go through, BellSouth's retail affiliate, BellSouth.net, as well as other CLECs that sign contracts with BellSouth to resell BellSouth facilities, are able to obtain loop make-up information electronically and instantaneously for orders of their DSL products. Complaint, ¶ 19. BellSouth has denied Mpower access to the electronic loop make-up information (termed the "Loop Qualification System") unless Mpower agrees to resell BellSouth's facilities and execute a long term agreement to that effect. *See* Complaint, ¶ 20. The Loop Qualification System was designed to support only BellSouth's Retail and Resale services. Since

Mpower has its own switches and network equipment, even if Mpower had access to the Loop Qualification System, it could not screen Mpower network facilities and equipment. *See* Complaint, ¶ 21. BellSouth has represented to Mpower that it is in the process of developing a new computerized pre-ordering system that will allow Mpower to obtain loop make-up information electronically. The system was targeted for implementation in July 2000, but as of this time the system has not been delivered, and Mpower expects that it will not be operational for some time. *See* Complaint, ¶ 22.

Furthermore, because BellSouth has failed to provide any electronic means for Mpower to place DSL orders, Mpower must manually complete a multi-page order form and fax it to BellSouth for processing, thereby increasing ordering costs, time, and the probability of human error. BellSouth then charges a manual service order charge for DSL orders. *See* Complaint, ¶ 23. BellSouth has represented to Mpower that it is in the process of developing a new computerized ordering system. The new system was targeted for July 2000, but has not yet been completed. *See* Complaint, ¶ 24.

Mpower alleges that the provision of high-speed internet access is a distinct product market in the southern Florida area (the "High–Speed Internet Access Market"), and that BellSouth currently controls a monopoly market share of the High–Speed Internet Access Market. *See* Complaint, ¶¶ 26, 28. Mpower competes with BellSouth with respect to providing high-speed internet access through the deployment of DSL in the High–Speed Internet Access Market. Complaint, ¶ 27. Mpower alleges that BellSouth has engaged in a pattern of anticompetitive conduct generally designed to leverage BellSouth's monopoly power obtained through

its ubiquitous local telecommunications network into artificially enhanced market power in the High–Speed Internet Access Market. Complaint, ¶ 29.

## II. Standard of Review

### A. Rule 12(b)(1)

■ Attacks on subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) come in two forms. "Facial attacks" on the complaint "require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.), cert. denied, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)). "Factual attacks," on the other hand, challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.*

■ These two forms of attack differ substantially. On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true. *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). But when the attack is factual, the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir.1990). In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *Id.* at 412–13 (quoting *Mortensen*, 549 F.2d at 891).

In this case, Defendant has made a facial attack upon the Complaint and has not attempted to present any factual evidence from outside the Complaint to the Court. Therefore, the motion to dismiss will be reviewed under the same standards as a Rule 12(b)(6) motion, which are set forth below.

### B. Rule 12(b)(3)

Rule 12(b)(3) of the Federal Rules of Civil Procedure provides for dismissal of an action on the basis of improper venue. For defenses raised under Rule 12(b)(3), the court may consider matters outside the pleadings if presented in proper form by the parties. *See Transmirra Prods. Corp. v. Fourco Glass Co.*, 246 F.2d 538–39 (2nd Cir.1957) (resolving motion to dismiss because of improper venue "in the usual manner on affidavits, here supplemented by answers to interrogatories, and a deposition from one of defendant's employees in the district, rather than by a full trial"); *see generally* 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1364 (2nd ed.1990). In a case such as this, where the parties have not presented additional material to the court, the motion is analyzed under the same standards as a motion to dismiss under Rule 12(b)(6).

### C. Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that dismissal of a claim is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent

with the allegations." *Blackston v. Alabama,* 30 F.3d 117, 120 (11th Cir.1994) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). On a motion to dismiss, the Court must accept as true all facts alleged and draw all inferences therefrom in the light most favorable to the non-moving party. *See Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1483 (11th Cir.1994). A very low sufficiency threshold is necessary for a complaint, or counterclaim, to survive a motion to dismiss. *See Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 703 (11th Cir.1985) (citation omitted). Moreover, a complaint should not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *M/V Sea Lion V v. Reyes,* 23 F.3d 345, 347 (11th Cir.1994) (citation omitted). However, a plaintiff must do more than merely "label" its claims. *See Blumel v. Mylander,* 919 F.Supp. 423, 425 (M.D.Fla.1996). Dismissal is appropriate only when no construction of the factual allegations of a complaint will support the cause of action. *See Marshall County Bd. of Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir.1993) (citation omitted). The issue is not whether the plaintiff will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Little v. City of North Miami,* 805 F.2d 962, 965 (11th Cir.1986) (citation omitted).

## III. Discussion

### A. The Antitrust–Based Claims (Counts I & II)

Counts I and II allege claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, for monopolization and attempted monopolization, respectively, of the market for High–Speed Internet Access. Mpower alleges that BellSouth has sought to leverage the power it has obtained through its local telecommunications network into artificially enhanced market power in the High–Speed Internet Access market by providing Mpower with a manual, instead of electronic, means of obtaining loop make-up information and of ordering DSL capable loops. A thorough analysis of the Complaint shows that Mpower seeks to enforce BellSouth's obligations under the Telecommunications Act through the tool of an antitrust suit—a theory that was recently examined and rejected by the United States Court of Appeals for the Seventh Circuit in *Goldwasser v. Ameritech Corp.,* 222 F.3d 390 (7th Cir.2000). Based on the reasoning of *Goldwasser,* this Court finds that Plaintiff has failed to state a claim upon which relief may be granted.

In *Goldwasser,* the Seventh Circuit affirmed the dismissal of an antitrust suit alleging that the Defendant, Ameritech, an incumbent local exchange carrier (ILEC), was not fulfilling its obligations under the Telecommunications Act of 1996 and was unlawfully monopolizing under Section 2 of the Sherman Act. The *Goldwasser* plaintiffs alleged generally that Ameritech had monopoly power in the market for local telephone service, controlled a number of so-called essential facilities (e.g., telephone lines and equipment) that its competitors were unable to duplicate, and engaged in exclusionary practices to prevent its competitors from entering the market. *Goldwasser,* 222 F.3d at 394. Furthermore, the *Goldwasser* plaintiffs specified 20 specific exclusionary or monopolistic practices that they alleged violated both § 2 of the Sherman Act and the Telecommunications Act of 1996, amongst which were the following allegations: (1) Ameritech failed to "provid[e] the same quality of service to its competitors as it provides to itself"; (2)

Ameritech did not "give[ ] its competitors nondiscriminatory access to its operational support systems," nor did it "give[ ] them access to unbundled elements of its system on terms equivalent to those Ameritech enjoys"; (3) "Ameritech's competitors have experienced undue delays (presumably caused by Ameritech) in acquiring unbundled elements, and those delays have precluded them from offering services as attractive as Ameritech's"; (4) Ameritech caused its competitors to "experience[ ] delays and discrimination as they have sought to gain access to unbundled loops"; (5) Ameritech "failed to provide interconnection between its network and those of competitors that is equal to the interconnections it gives itself'"; and (6) Ameritech "refused to allow its competitors to connect with its local telephone network on just, reasonable, and nondiscriminatory terms." *Goldwasser*, 222 F.3d at 394–95.

The Seventh Circuit set forth a detailed explanation of the history and design of the Telecommunications Act of 1996 as well as a review of § 2 of the Sherman Act (*see Goldwasser*, 222 F.3d at 392–94 and 396–98), concluding that "the 1996 [Telecommunications] Act imposes duties on the ILECs that are not found in the antitrust laws" and that the plaintiffs did not state a Section 2 claim when they accused Ameritech of failing to comply with its duties under the Telecommunications Act. *Goldwasser*, 222 F.3d at 401. The Court found it "both illogical and undesirable to equate a failure to comply with the 1996 Act with a failure to comply with the antitrust laws." *Id.* at 400. In explaining its decision, the *Goldwasser* Court stated:

> Congress could have chosen a simple antitrust solution to the problem of restricted competition in local telephone markets. It did not. Instead, in an effort to jump-start the development of competitive local markets, it imposed a host of special duties on the ILECs; it

entrusted supervision of those duties to the FCC and the state public utility commissions; and it created a system of negotiated agreements through which this would be accomplished. These are precisely the kinds of affirmative duties to help one's competitors that we have already noted do not exist under the unadorned antitrust laws.

*Id.* at 399–400.

The *Goldwasser* Court also rejected any antitrust claims which were arguably not based on violations of the Telecommunications Act, such as Plaintiff's allegations that Ameritech dominates and controls essential facilities that its competitors cannot reasonably duplicate and that Ameritech refuses to deal with its competitors on just, reasonable, and nondiscriminatory terms, finding such claims to be overridden by the Telecommunications Act. The Court stated:

> [W]hen one reads the complaint as a whole these allegations appear to be inextricably linked to the claims under the 1996 Act. Even if they were not, such a conclusion would then force us to confront the question whether the procedures established under the 1996 Act for achieving competitive markets are compatible with the procedures that would be used to accomplish the same result under the antitrust laws. In our view, they are not. The elaborate system of negotiated agreements and enforcement established by the 1996 Act could be brushed aside by any unsatisfied party with the simple act of filing an antitrust action. Court orders in those cases could easily conflict with the obligations the state commissions or the FCC imposes under the [47 U.S.C.] sec. 252 agreements. The 1996 Act is, in short, more specific legislation that must take precedence over the general antitrust

laws, where the two are covering precisely the same field.

*Goldwasser,* 222 F.3d at 401.

The *Goldwasser* case is on all fours with this case, and its reasoning and conclusions are persuasive. In this case, as in *Goldwasser,* Mpower's claims are based on alleged violations of the Telecommunications Act or FCC orders implementing the Telecommunications Act. For example, Mpower's claims that BellSouth has failed to provide electronic loop make-up information and electronic ordering functionality directly implicate 47 U.S.C. § 251. As such, the Complaint does not state a violation of the Sherman Act. Furthermore, just as the plaintiffs in *Goldwasser* argued that they broadly stated claims that do not implicate the Telecommunications Act by alleging that a monopolistic company denied them reasonable access to essential facilities, Mpower in this case argues that its Complaint does not implicate the provisions of the Telecommunications Act because it broadly alleged that BellSouth sought to leverage its monopoly power in one market into artificially enhanced market power in another. As noted in *Goldwasser,* such claims are inextricably intertwined to the claims under the Telecommunications Act and, even if they were not, the Telecommunications Act is more specific legislation that takes precedence over the general antitrust legislation. Accordingly, the Plaintiff has failed to state a cognizable claim for antitrust violations under § 2 of the Sherman Act in Counts I and II.[2]

## B. The Claim of Violation of the FCC's *UNE Remand Order* (Count III)

■ Mpower's third claim for relief alleges that BellSouth violated the FCC's *UNE Remand Order,* and seeks a "writ of injunction or other proper process to enforce Defendant's obedience" to the Order pursuant to 47 U.S.C. § 401(b).[3] Mpower alleges that under the FCC's *UNE Remand Order,* BellSouth must provide access to underlying loops and any DSL capable loops that a CLEC requires in whichever flavor of DSL the CLEC chooses to offer. *See* Complaint, ¶¶ 13 & 14.[4]

Defendant argues that this Court lacks jurisdiction over Count III and that

2. Defendant argued in the alternative that Mpower's antitrust claims are barred by implied antitrust immunity and that; even if the antitrust laws were applicable, Mpower's specific complaint in this matter does not state an antitrust claim. Based on the above holding, these arguments need not be reached. Defendant also argued that the Court should dismiss the complaint based on the exclusive or primary jurisdiction of the state public service commissions. The Court finds that it is also not necessary to address this argument in light of the applicability of *Goldwasser v. Ameritech Corp.* 222 F.3d 390 (7th Cir.2000), to this case.

3. 47 U.S.C. § 401(b) provides:
If any person fails or neglects to obey any order of the [Federal Communications] Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

4. The Court notes that paragraphs 13 and 14 of the Complaint contain unsupported legal conclusions as to the effect of the *UNE Remand Order* which the Court need not accept as true when evaluating the motion to dismiss.

Count III fails as a matter of law because the *UNE Remand Order* is not an order that can be enforced using the procedures established in 47 U.S.C. § 401(b). According to the Defendant, § 401(b) only permits challenges to adjudicative FCC orders, not orders promulgated pursuant to the FCC's rulemaking authority. In support of this proposition the Defendant relies heavily on *New England Telephone & Telegraph Co. v. Public Utilities Comm'n of Maine*, 742 F.2d 1 (1st Cir. 1984), calling it "[t]he most comprehensive and persuasive analysis of the limits of Section 401(b)." Memorandum of Law in Support of Defendant's Motion to Dismiss, p. 23.

Although the Eleventh Circuit has not yet addressed the issue of what constitutes an 'order' subject to the enforcement procedures of § 401(b), every Circuit other than the First Circuit to address the issue, including the Fourth, Fifth, Sixth, Seventh, Eight, and Ninth, has rejected the approach set forth in *New England Telephone* and advocated by Defendant's in this case. *See Hawaiian Tel. Co. v. Public Util. Comm'n*, 827 F.2d 1264, 1271–72 (9th Cir.1987), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988); *Alltel Tennessee, Inc. v. Tennessee Public Serv. Comm'n*, 913 F.2d 305, 308 (6th Cir.1990); *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 740 F.2d 566, 571 (7th Cir.1984); *Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n*, 748 F.2d 879, 880–81 (4th Cir.1984), *vacated and remanded for proceedings consistent with Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), 476 U.S. 445, 106 S.Ct. 2239, 90 L.Ed.2d 444 (1986); *South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n*, 744 F.2d 1107, 1115 (5th Cir.1984), *vacated and remanded for consideration in light of Chesapeake & Potomac, supra*, 476 U.S. 1166, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986); *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 738 F.2d 901 (8th Cir.1984), *vacated and remanded for further consideration in light of Chesapeake & Potomac, supra*, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 973 (1986).

█ This Court finds the position held by the majority to be persuasive. Congress, rather than attempting to limit § 401(b) exclusively to adjudicatory orders, intended that a broad range of orders be reviewable under § 401(b). *See Alltel Tennessee*, 913 F.2d at 308; *Hawaiian Tel. Co.*, 827 F.2d at 1271–72.

█ However, this does not end the jurisdictional inquiry or necessarily mean that the rulemaking order at issue in this case is enforceable through § 401(b). As noted in *Mallenbaum v. Adelphia Communications Corp.*, 74 F.3d 465, 468 (3rd Cir. 1996), private enforcement actions under § 401(b) are only available where the order in question requires or prohibits specific action by a specific party. *See also In re Comcast Cable TV Rate Regulation*, 1994 WL 622105 at *19 (E.D.Pa.1994). Federal jurisdiction is lacking when the rule in question is prospective and unrelated to specific rights and/or obligations of the litigants, and is thus more akin to a general rulemaking than to an order. *Mallenbaum*, 74 F.3d at 469.

In this case, the *UNE Remand Order* that Plaintiff seeks to enforce does not direct or order the concrete actions urged on the Defendant by the Plaintiff, and it is therefore not enforceable under § 401(b). Mpower contends that Sections 191 and 428 of the *UNE Remand Order* require that BellSouth provide it with nondiscriminatory access to the underlying loop quali-

**1354**

fication information.[5]

However, the FCC did not set forth any specific standards in the *UNE Remand Order* as to how nondiscriminatory access to the underlying loop qualification information is to be provided. In Section 429, the Commission states:

> We disagree, however, with Covad's unqualified request that the Commission require incumbent LECs to catalogue, inventory, and make available to competitors loop qualification information through automated OSS ["Operating Support Systems"] even when it has no such information available to itself. If an incumbent LEC has not compiled such information for itself, we do not require the incumbent to conduct a plant inventory and construct a database on behalf of requesting carriers. We find, however, that an incumbent

**5.** Sections 191 and 428 of the *UNE Remand Order* state the following:

> 191. As the Commission stated in the *Local Competition First Report and Order*, requiring incumbents to provide conditioned loops will, in some instances, require the incumbent LEC to take affirmative steps to enable requesting carriers to provide services that the incumbent does not currently provide. We now clarify that we require the incumbent to provide loops with all their capabilities intact, that is, to provide conditioned loops, *wherever* a competitor requests, even if the incumbent is not itself offering xDSL to the end-user customer on that loop. Thus, incumbent LECs cannot refuse a competitive LEC's request for conditioned loops on the grounds that they themselves are not planning to offer xDSL to that customer. (citation omitted; emphasis in original)

> 428. In addition, we agree with Covad that an incumbent LEC should not be permitted to deny a requesting carrier access to loop qualification information for particular customers simply because the incumbent is not providing xDSL or other services from a particular end office. We also agree with commenters that an incumbent must provide ac-

LEC that has manual access to this sort of information for itself, or any affiliate, must also provide access to it to a requesting competitor on a non-discriminatory basis. In addition, we expect that incumbent LECs will be updating their electronic database for their own xDSL deployment and, to the extent their employees have access to the information in an electronic format, that same format should be made available to new entrants via an electronic interface.

*UNE Remand Order*, § 429. Thus, the Commission expressly refused to require ILECs to make loop information available through automated OSS unless the ILEC is using such a system itself. Furthermore, in § 437, the Commission took care to disclaim any intent to impose specific obligations on ILECs concerning automat-

cess to the underlying loop information and may not filter or digest such information to provide only that information that is useful in the provision of a particular type of xDSL that the incumbent chooses to offer. For example, SBC provides ADSL service to its customers, which has a general limitation of use for loops less than 18,000 feet. In order to determine whether a particular loop is less than 18,000 feet, SBC has developed a database used by its retail representatives that indicates only whether the loop falls into a "green, yellow, or red" category. Under our nondiscrimination requirement, an incumbent LEC can not limit access to loop qualification information to such a "green, yellow, or red" indicator. Instead, the incumbent LEC must provide access to the underlying loop qualification information contained in its engineering records, plant records, and other back office systems so that requesting carriers can make their own judgments about whether those loops are suitable for the services the requesting carriers seek to offer. Otherwise, incumbent LECs would be able to discriminate against the other xDSL technologies in favor of their own xDSL technology. (citations omitted)

ed access to OSS information and stated that the state public service commissions should handle such decisions:

> We decline to adopt performance standards in this proceeding. The issue before us in this proceeding is whether OSS is subject to unbundling obligations of section 251, not whether the Commission should establish performance standards and penalties to determine if an incumbent is providing nondiscriminatory access to its OSS functions. We note that the states have primary authority under section 252 for setting schedules and resolving disputes concerning access to OSS functions as unbundled network elements.

*UNE Remand Order,* § 437.

Thus, the order Plaintiff is attempting to enforce in this case declined to specify concrete requirements as to the manner and type of technical information that must be made available to CLECs. The matter requires an initial determination and input from the state PSCs that have been delegated the power to resolve this question, and, in fact, Mpower has been concurrently pursuing a nearly identical claim before the Georgia Public Service Commission. *See* Complaint of MGC Communications, Inc. d/b/a Mpower Communications Corp. in *In re Complaint of MGC Communications, Inc. d/b/a Mpower Communications Corp. Against BellSouth Communications, Inc. For Failure to Provide Unbundled Network Elements Pursuant to Interconnection Agreement and U.S.C. § 251(c)(3),* Georgia Public Service Commission Docket No. 12124U, filed on March 31, 2000, included as Exhibit C to Defendant's Appendix in Support of Motion to Dismiss. Therefore, the issue is unenforceable as a Rule 401(b) action and is better left for an initial decision by the appropriate administrative agencies.

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss [D.E. 10] is GRANTED and this matter is dismissed. It is further

**ORDERED AND ADJUDGED** that all pending motions not otherwise resolved by this order are dismissed as moot and this case is CLOSED.