COVAD COMMUNICATIONS COMPANY, et al.,
Plaintiffs,

v.

BELL ATLANTIC CORP., et al., Defendants.

No. Civ. A. 99–1046(GK)

United States District Court, District of Columbia.

May 3, 2002.

John Richard Gerstein, I, Merril Jay Hirsh, Ross, Dixon & Bell, LLP, Washington, DC, Brad Sonnenberg, Covad Communications Company, Santa Clara, CA, James Stubblefield, Jason S. Hartley, Ross, Dixon & Bell, LLP, San Diego, CA, Susan Jin Davis, Covad Communications Company, Washington, DC, for Plaintiffs.

Robert J. Zastrow, Bell Atlantic Network Services, Inc., Arlington, VA, Dan K. Webb, George C. Lombardi, Winston & Strawn, Chicago, IL, Mark C. Hansen, Reid M. Figel, Sarah O. Jorgensen, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, Jon Thorne, Arlington, VA, Richard G. Taranto, Farr & Taranto, Washington, DC, Charles Bennett Molster, III, Winston & Strawn, Washington, DC, for Defendants.

Mark Ford Wilson, Communications Workers of America, Justin Sanjeeve Antonipillai, Arnold & Porter, Washington, DC, for Non Parties.

Andrew Gerald McBride, Jr., Wiley, Rein & Fielding, Washington, DC, for Amicus.

Robert J. Zastrow, Bell Atlantic Network Services, Inc., Arlington, VA, Deborah L. Winstead, Estabrook & Associates, P.C., McLean, VA, David M. Estabrook, Estabrook & Associates, McLean, VA, John Richard Gerstein, I, Ross, Dixon & Bell, LLP, Washington, DC, for Movants.

## *MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiffs, Covad Communications Company and Dieca Communications, Inc. (collectively "Covad"), bring this antitrust action for damages and injunctive relief against Defendants, Bell Atlantic Corporation and its subsidiaries (collectively, "Bell Atlantic").

The matter is now before the Court on Defendants' Motion to Dismiss the Second Amended Complaint. Upon consideration of the Motion, Opposition, Reply, Sur-reply, the numerous submissions of supplemental authority submitted by parties, the Motions Hearing held on March 11, 2002, and the entire record herein, for the reasons stated below, the Court **grants** Defendants' Motion to Dismiss.

1. For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. *Shear v. National Rifle Ass'n of Am.*, 606 F.2d 1251, 1253 (D.C.Cir.1979). Therefore, the facts set forth herein are taken from Covad's Complaint.

2. DSL is a means of transmitting signals over existing copper telephone wires at a rate many times faster than dial-up modems, while, at the same time, leaving the phone line free for concurrent regular telephone and facsimile use. *See* Compl. ¶¶ 45–49.

3. These subsidiaries are: Bell Atlantic Network Services, Inc. ("BANSI"), Telesector Resources Group, Inc. ("TRG"), Bell Atlantic Internet Solutions, Inc. ("BAIS"), Bell Atlantic–Washington, D.C., Inc., Bell Atlantic–Virginia, Inc., Bell Atlantic–West Virginia, Inc.,

## I. BACKGROUND[1]

Covad is a California-based start-up company founded in 1996 that uses a technology called Digital Subscriber Line ("DSL") to provide high-speed Internet services, as well as other network and data services.[2]

Defendants are collectively the Bell Atlantic Corporation and its twelve subsidiaries.[3] Bell Atlantic provides telecommunications and local exchange services in thirteen states along the North Eastern Seaboard as well as in the District of Columbia.[4]

Covad alleges that Bell Atlantic has unlawfully maintained monopoly power in various telecommunications markets, including the DSL market, and has engaged in anticompetitive and exclusionary conduct in violation of Section 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 ("Sherman Act"), Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26 ("Clayton Act"), the District of Columbia Antitrust Act of 1980, D.C.Code §§ 28–4503, 4508 and common law.

Bell Atlantic–Maryland, Inc., Bell Atlantic–Delaware, Inc., Bell Atlantic–New Jersey, Inc., Bell Atlantic–Pennsylvania, Inc., New York Telephone Company, and New England Telephone and Telegraph Company. *See* Compl. ¶¶ 13–32.

4. Bell Atlantic is one of the Regional Bell Operating Companies that was divested from AT & T as part of the 1983 Modified Final Judgment ("MFJ") entered by this District Court. *See United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982) (*AT & T II*), *aff'd. sub no. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). As a result of the MFJ, Bell Atlantic was permitted to provide services in the following thirteen states: West Virginia, Virginia, Maryland, Delaware, New Jersey, Pennsylvania, New York, part of Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine.

Before turning to the particulars of Covad's Complaint, some general explanation about the regulatory framework within which the parties operate is warranted.

## A. Telecommunications Act of 1996

The relationships between the parties are governed in large part by the Telecommunications Act of 1996, Pub.L. 104–104, 110 Stat. 56 (1996), codified at 47 U.S.C. § 151 *et seq.* ("1996 Act" or the "Act"), which sought to jump-start competition in the communications industry after a lengthy period of state and FCC regulated monopolies. The goal of the 1996 Act was to transform the telecommunications industry from a monopolistic setting to a competitive one.[5]

To encourage competition, the Act requires that those companies that have historically provided telephone services, referred to as "incumbent local exchange carriers" or "ILECs," provide certain services to new entrants in the telecommunications market, referred to as "competitive local exchange carriers" or "CLECs."

Among other things, the 1996 Act requires that ILECs permit "interconnection" with their local telecommunications network.[6] Specifically, ILECs must give new entrants access to their local network on terms that are "just, reasonable and non-discriminatory" so that these new en-

trants or CLECs can compete with ILECs in existing and emerging telecommunications markets. 47 U.S.C. § 251. Furthermore, the 1996 Act establishes a set of procedures for making and enforcing "interconnection agreements" between ILECs and CLECs for access to local networks. 47 U.S.C. § 252.

Since December of 1997, Covad (a CLEC) and Bell Atlantic (an ILEC), have entered into numerous interconnection agreements concerning access to Bell Atlantic's local network. All of these agreements have been, or currently are, the subject of dozens of enforcement proceedings before numerous state regulatory bodies and the FCC.

## B. Covad's Complaint

In this action, Covad alleges that Defendants have unlawfully maintained their monopoly power in various telecommunications markets by engaging in a pattern of "unlawful, anticompetitive and fraudulent practices" in order to prevent Covad's entry into those markets. Compl. ¶ 7.

In particular, Covad alleges that its DSL services threaten Bell Atlantic's monopoly power in three different product markets, namely the "Local Internet Access Market," the "Local Telecommuting Market," and the "Local Voice Services Market."[7] *See* Compl. ¶ 53. Covad also

---

5. The House Conference Report explains that the purpose of the 1996 Act was to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition ..." H.R.Conf.Rep. 104–458, at 1 (1996).

6. A local telecommunications network comprises millions of telephone lines ("loops"), switches, transmission facilities, poles, conduits, ducts, and rights-of-way. It also in-

cludes equipment, facilities, and other services.

7. The "Local Internet Access" market is the market for local telecommunication services that connect residences and businesses with Internet service providers. The "Local Telecommuting Market" is the market for local telecommunications services that connect people who work at home with their employers' internal computer networks. The "Local Voice Services Market" is the market for local telecommunications services that brings voice lines to homes and businesses within the "Local Access and Transport Areas" or "LATAs,"

asserts the existence of hundreds of different geographic markets in the states Bell Atlantic serves.[8]

Virtually all the conduct of which Plaintiffs complain concerns Bell Atlantic's failure to perform duties required under the 1996 Act. Chief among these allegations is that Bell Atlantic has denied Covad access to its local telephone network in the following four ways: (1) refusing to "collocate" or provide physical space and facilities for the placement of Covad's equipment within Bell Atlantic's central offices, Compl. ¶¶ 91–124; (2) denying access to "local loops," which are the wires running between Bell Atlantic's central offices and customers' premises, Compl. ¶¶ 125–177; (3) refusing to maintain adequate operations support systems ("OSS"), the computer systems that Covad along with numerous other new entrants in the local telecommunications markets must use to order loops from Bell Atlantic, Compl. ¶¶ 131–135; and (4) denying access to the "transport" facilities that connect Covad's central office equipment with other points in Covad's network, Compl. ¶¶ 175–177.

Covad argues that Bell Atlantic has repeatedly denied or delayed access to these four dimensions of the local telephone network. Plaintiffs further allege that timely access to Bell Atlantic's local network is essential to their provision of DSL services

and to competition in the relevant telecommunications markets. *See* Compl. ¶¶ 89–177.

Plaintiffs' other allegations of anticompetitive conduct include price squeezing and refusal to line share, *see* Compl. ¶¶ 178–185; misleading and fraudulent advertising, *see* Compl. ¶¶ 186–192; bad faith negotiations, *see* Compl. ¶¶ 196–201; and patent misuse, *see* Compl. ¶¶ 202–212.

Plaintiffs filed this action on April 28, 1999, amending their Complaint twice, once on July 8, 1999, and again on August 10, 2000. The Court has issued two Memorandum Opinions since then, both of which denied Non-resident Defendants' Motions to Dismiss for Lack of Personal Jurisdiction.[9] Defendants now move to dismiss the entire case for failure to state a claim. Fed.R.Civ.P. 12(b)(1) and (b)(6). The Court heard oral argument on this Motion on March 11, 2002.

## II. STANDARD OF REVIEW

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 119 S.Ct. 1661, 1676, 143 L.Ed.2d 839 (1999).

---

which are geographically designated zones in which Bell Atlantic is permitted to complete telephone calls without turning them over to an inter-exchange carrier, such as AT & T or Worldcom. *See* Compl. ¶ 53.

On October 25, 2001, Covad filed a Motion for Leave to Amend the Complaint, which the Court denied without prejudice on January 3, 2002, pending resolution of Defendants' Motion to Dismiss. In their Motion to Amend, Plaintiffs sought to alter the product markets alleged by combining the "Telecommuting Market" and the "Local Internet Access Market." *See* Pls.' Mot. for Leave to Amend Compl. at 2.

8. In Plaintiffs' Motion for Leave to Amend the Complaint, filed on October 25, 2001, Covad sought to redefine the geographic markets alleged. Covad originally viewed each central office as a separate geographic market. Covad sought to amend its Complaint by alleging that each metropolitan area was a separate geographic market. *See* Pls.' Mot. to Amend the Compl. at 3–5.

9. *See* Memorandum Opinions and Orders dated December 16, 1999, and May 30, 2001.

## III. ANALYSIS

### A. All Antitrust Claims Related to 1996 Act Duties Must Be Dismissed

 The heart of Plaintiffs' Complaint is that Bell Atlantic has violated Section 2 of the Sherman Act, which prohibits (1) the willful acquisition or maintenance of monopoly power in the relevant market (2) by the use of exclusionary or predatory conduct "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *United States v. Griffith*, 334 U.S. 100, 108, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). A showing of "exclusionary" conduct is an absolute pre-requisite to stating a claim under Section 2.

A careful review of the Complaint reveals that virtually all allegations of exclusionary conduct, with the exception of the retaliatory patent law suit, relate to Bell Atlantic's failure to comply with the myriad duties contained in sections 251 and 252 of the 1996 Act.

Specifically, Covad alleges that Bell Atlantic engaged in "exclusionary" conduct through denial or delay of access to its local network in the areas of collocation,[10] access to loops,[11] adequate operations support systems,[12] transport services,[13] and line sharing,[14] all of which are expressly governed by §§ 251(c)(1), (2), (3) and (6) of the 1996 Act as well as by particular provisions in the interconnection agreements entered into between the parties. Plaintiffs also allege that Defendants engaged in exclusionary conduct through price squeezing,[15] misleading advertising about its own DSL services,[16] sham negotiations,[17] and a retaliatory patent lawsuit,[18]

10. Covad alleges that Bell Atlantic has made false claims of no space, *see* Compl. ¶¶ 98–104; required unreasonable build-outs, *id.* ¶ 117; overcharged for construction build out costs and power costs, *id.* ¶¶ 115–123; and failed to deliver usable collocation space in a timely manner, *id.* ¶ 124.

11. Covad alleges that Bell Atlantic has failed to provide loop pre-qualification information, *see* Compl. ¶¶ 125–130; unreasonably delayed the supply of loops for Covad's end users, *id.* ¶¶ 136–145; refused to provide "long loops" or "repeaters" to Covad in order to boost the voltage of the digital signal, *id.* ¶¶ 150–157; overcharged for long loops, *id.* ¶¶ 158–162; refused to provide copper loops for Covad's end users, which would make service faster, *id.* ¶¶ 163–167; delayed access to remote terminals, which would allow for higher speed service, *id.* ¶¶ 168–170; and failed to develop a procedure to correct problems with Covad's loops, *id.* ¶¶ 171–174.

12. Covad alleges that Bell Atlantic failed to provide adequate operations support systems by not adopting an efficient means of processing orders and correcting errors in orders. *See* Compl. ¶¶ 131–135.

13. Covad alleges that Bell Atlantic delayed its orders for transport (*i.e.*, facilities connecting points within Covad's network) and in the provisioning of "customer circuits." *See* Compl. ¶¶ 175–177.

14. Covad alleges that Bell Atlantic refused to allow it to use existing voice lines to provide digital service, and instead required it to order and install a second line for these services. *See* Compl. ¶¶ 178–181.

15. Covad alleges that Bell Atlantic price squeezed by charging it and other wholesale customers the same price for unbundled loops that it charges its own customers for final DSL services. *See* Compl. ¶ 178

16. Covad alleges that Bell Atlantic advertised DSL services that it knew it could not deliver in order to prevent DSL competitors, such as Covad, from capturing the first-mover advantage. *See* Compl. ¶¶ 186–192.

17. Covad alleges that Bell Atlantic engaged in "sham negotiations" in connection with amendments to and enforcement of various interconnection agreements. *See* Compl. ¶¶ 196–201.

18. Covad alleges that Defendants filed a retaliatory patent lawsuit in response to this action. *See* Compl. ¶¶ 202–212.

conduct which, with the exception of the patent suit, is also governed by the 1996 Act and the interconnection agreements between the parties.

For the reasons discussed below, the Court concludes that none of these allegations, if proven, can be "exclusionary" conduct within the meaning of antitrust law and that therefore, Covad's claims related to the 1996 Act must be dismissed.

### 1. The 1996 Act Contains Affirmative Duties That Extend Beyond the Requirements of Anti–Trust Law

■ First, Covad's allegations, which essentially relate to Bell Atlantic's failure to comply with 1996 Act duties, fall squarely outside the parameters of antitrust law. As recognized by the Seventh Circuit in *Goldwasser v. Ameritech Corporation*, 222 F.3d 390 (7th Cir.2000), the 1996 Act contains duties and obligations of affirmative assistance that "go well beyond anything the antitrust laws would mandate on their own." 222 F.3d at 400. Almost every court since *Goldwasser* has recognized this to be true.[19]

■ The reason for this nearly unanimous consensus is that the 1996 Act was designed by Congress to spur competition in local telephone markets in ways that the

antitrust laws did not require. As the Seventh Circuit explained in *Goldwasser*, "Congress could have chosen a simple antitrust solution to the problem of restricted competition in local telephone markets. It did not." *Goldwasser*, 222 F.3d at 399. Instead, Congress created a new statutory system of "more specific and far-reaching obligations [than imposed by the antitrust laws] that [it] believed would accelerate the development of competitive markets." *Id.* at 401. Specifically, Congress imposed on ILECs a "host of special duties" or "affirmative duties to help one's competitors" that "do not exist under the unadorned antitrust laws." *Id.* at 399.

■ Consequently, the duties of affirmative assistance set forth in the 1996 Act exist outside the parameters of pre-existing antitrust law. Bell Atlantic's alleged failure to comply with those duties, which is the lion's share of Plaintiffs' Complaint, does not constitute "exclusionary" conduct as a matter of law, which is the *sine qua non* of any antitrust violation.

### 2. The Plain Language of the 1996 Act Precludes Creation of Anti-trust Claims for 1996 Act Duties

■ Second, the savings clauses of the 1996 Act preclude expansion of antitrust

---

19. In *Goldwasser*, the Seventh Circuit dismissed a complaint in a case raising substantially similar facts to those at bar. Nearly every district court since then has relied on *Goldwasser* and dismissed antitrust claims based on conduct subject to the 1996 Act. *See, e.g., MGC Communications, Inc., v. BellSouth Telecommunications*, Inc., 146 F.Supp.2d 1344, 1350–1352 (S.D.Fla.2001); *Law Offices of Curtis v. Trinko, LLP v. Bell Atlantic Corp.*, 123 F.Supp.2d 738 (S.D.N.Y.2000); *Law Offices of Curtis v. Trinko, LLP v. Bell Atlantic Corp.*, No. 00 Civ.1910 (S.D.N.Y. Apr.26, 2001); *Covad Communications Co. v. BellSouth Corp.*, No. 1:00–CV–3414 (N.D.Ga. July 6, 2001); *Supra Telecommunications & Information Systems, Inc. v. BellSouth Telecommunications, Inc.*, No. 99–1706–Civ (S.D.Fla.

June 8, 2001); *Building Communications, Inc. v. Ameritech Services, Inc.*, No. 97–CV–76336 (E.D.Mich. June 21, 2001); *Intermedia Communications, Inc., v. Bellsouth Telecommunications, Inc.*, 173 F.Supp.2d 1282 (M.D.Fla.2000); *Cavalier Communications, LLC v. Verizon Virginia Inc.*, No. 3:01CV736 (E.D.Va. March 27, 2002); *but see Stein v. Pacific Bell Tel. Co.*, 173 F.Supp.2d 975 (N.D.Cal.2001) (properly pled antitrust theories based upon denial of access to essential facilities, monopoly leveraging and monopolistic refusal to deal not barred by *Goldwasser* even though facts supporting those theories relate to duties under 1996 Act); *Davis v. Pacific Bell*, Nos. C 01–0260 & C 01–585 (N.D.Cal. Jan. 10, 2002).

law to incorporate 1996 Act duties. The 1996 Act contains two savings clauses. Section 601(c)(1), the general savings clause, provides that "[t]his Act ... shall not be construed to modify, impair or supersed federal, State, or local law unless expressly so provided." The Act also provides a savings clause that specifically refers to antitrust remedies: "nothing in this Act ... shall be construed to modify, impair, or supersede the applicability of the antitrust laws." 47 U.S.C. § 152, Historical and Statutory Notes. Pub.L. No. 104–104, 110 Stat. 56, § 601(b)(1).

In adopting these two separate savings clauses, Congress made explicit its intention that the 1996 Act should not in any way alter the application or scope of existing antitrust law. Thus, conduct that was proscribed prior to the 1996 Act remains proscribed after its enactment. Similarly, conduct that did *not* violate antitrust law prior to the 1996 Act does not now violate antitrust law after the Act. As explained above, there is nearly unanimous consensus that the 1996 Act imposes affirmative duties of assistance that require far more than the existing antitrust laws now require. If Congress intended antitrust liability and remedies to attach to violations of the specific and affirmative duties set forth in the 1996 Act, it certainly knew how to make its intention known by including provisions to that effect in the 1996 Act.

### 3. Plaintiffs Do Not State an Essential Facility Claim

Third, Plaintiffs fail to state an essential facility claim. Plaintiffs' primary argument is that Bell Atlantic's denial and delay of access to its local network amounts to denial of an "essential facility" in violation of antitrust law.

An essential facility claim requires that a monopolist who competes with the plaintiff in the monopolized market controls an essential facility, and refuses the plaintiff's request for access to that facility. *Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1088 (D.C.Cir.1998); *see also MCI Communications Corp. v. AT & T*, 708 F.2d 1081, 1132–33 (7th Cir.1983). The animating concern of this doctrine is to prevent a monopolist from extending monopoly power from one stage of production to another, and from one market to another. *Id.*

The essential facility doctrine, however, is a narrow and limited qualification of a firm's right to refuse to deal with its competitors. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 376 (7th Cir.1986). Because the purpose of antitrust law is to protect competition, not competitors, a firm—even one with lawful monopoly power—ordinarily has no duty under antitrust law to help its competitors. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Indeed, compulsory access to a firm's facilities, if it exists at all, is exceptional, particularly in a regulated industry. 3A Phillip Areeda & Herbert Hovenkamp, Antitrust Law, ¶¶ 771b, 771c, 773a (1996).

Furthermore, in order to prevail under an essential facility theory, Plaintiffs must still demonstrate an "anticompetitive effect." *See United States v. Microsoft*, 253 F.3d 34, 58 (D.C.Cir.2001). Specifically, the conduct must make a significant contribution to maintenance of its monopoly power, pose significant harm to competition, or otherwise "impair[ ] competition in an unnecessarily restrictive way." *Aspen Skiing*, 472 U.S. at 605–606, 105 S.Ct. 2847; 3 P. Areeda & H. Hovenkamp, *supra*, ¶ 651c at 78 (1996). Defendant's con-

duct must also lack a legitimate business justification in order to be unlawful or exclusionary. *Aspen Skiing,* 472 U.S. at 605–606, 105 S.Ct. 2847.

Finally, consideration of existing regulatory mechanisms and the degree to which they already address the alleged threat to competition is necessary. *see MCI v. AT & T,* 708 F.2d at 1106 ("the presence of a substantial degree of regulation, although not sufficient to confer antitrust immunity, may affect . . . the precise dimensions of the 'willful acquisition or maintenance' of [monopoly] power") (internal citations omitted); *Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 25 (1st Cir.1990) (regulation "dramatically alters the calculus of antitrust harms and benefits"; finding that price squeeze did not violate Sherman Act because prices were fully regulated); *see also* 1A P. Areeda & H. Hovenkamp, *supra,* ¶ 240(d) at 15, 17 (2000) ("Even when conduct is not exempt from antitrust laws, regulation of a market can bear heavily on the application of antitrust principles . . . The presence of regulation in some instances limits the antitrust role, and in some instances simply changes it . . . The impact depends on the nature of the regulatory regime, the nature of the antitrust claim, and the degree of supervision given by the agency to the challenged conduct.").

■ Viewed in light of these principles, Covad's allegations fail to state an essential facility claim. Those allegations focus on disputes over the terms for obtaining access to Bell Atlantic's local exchange network—an entitlement that was first created by the 1996 Act (not by the antitrust laws). The particular terms of that statutorily mandated access are now fully regulated by the FCC and state commissions through their oversight and approval of detailed interconnection agreements. In this setting, there can be no significant harm to competition or anti-competitive effect as a matter of antitrust law, as every relevant facet of Bell Atlantic's relationship with Covad is subject to regulation under the 1996 Act, the rulings of the FCC, and the affirmative and active supervision of state public utility commissions charged with the 1996 Act's enforcement. *See Goldwasser,* 222 F.3d at 401 ("antitrust laws would add nothing to the oversight already available under the 1996[Act]"); *cf. Town of Concord,* 915 F.2d 17 (price squeeze claims are not exclusionary conduct under Section 2 because no durable harm to competition in fully regulated markets).

The case at bar is simply unlike the paradigmatic denial of an essential facility that the Supreme Court analyzed in *Aspen Skiing Co.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), where an *unregulated* firm with monopoly power chose to "forgo cash revenues and efficient methods of doing business for the sole purpose of driving its rivals out of the market." *Goldwasser,* 222 F.3d at 398.

Nor is this the case of *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973),[20] where the Supreme Court upheld a finding of Section 2 liability against a public utility company

---

**20.** Specifically, after its voluntary supply contracts with retail competitors expired, Otter Tail Power refused to sell energy to those competitors at wholesale prices and refused to agree to "wheel" power to them from other wholesale suppliers outside of Otter Tail's wholesale monopoly market area. Significantly, the Federal Power Commission had only very limited authority to order interconnections between utilities. In these circumstances, the Court enjoined Otter Tail either to sell its own power or to wheel power supplied by other wholesalers to the downstream retail level. *Otter Tail Power,* 410 U.S. at 377–382, 93 S.Ct. 1022.

that refused to supply or "wheel" to retail competitors essential wholesale power that the governing regulatory scheme was without authority to compel. *See Otter Tail Power,* 410 U.S. at 375, 93 S.Ct. 1022 ("So far as wheeling is concerned, there is no authority granted the Commission under ... the Federal Power Act to order it ... the power to direct wheeling was left to the 'voluntary coordination of electric facilities' ") (citations omitted).[21]

This case, by contrast, involves disputes over access to Bell Atlantic's local network where the access is mandated by the 1996 Act, fully regulated by the FCC and state commissions, and clearly spelled out in detailed interconnection agreements approved by the FCC and state commissions. Bell Atlantic has no freedom to take any unilateral action relating to access to interconnection with the local networks.[22] In light of this regulatory scheme, application

of the essential facility doctrine and its underlying compulsory dealing rationale "would add nothing to the oversight already available under the 1996 law." *Goldwasser,* 222 F.3d at 401.

Accordingly, in view of established essential facility doctrine principles as well as the regulatory context of this case, the Court concludes that Plaintiffs fail to state an essential facility claim.

### 4. The Enforcement Schemes of the 1996 Act and Anti–Trust Law Are Fundamentally Incompatible

Finally, while not dispositive of the issue, the Court cannot help but note the fundamental incompatibility between the remedial schemes established by the antitrust laws and the 1996 Act. As explained above, most of the Complaint concerns conduct that is committed to the supervi-

---

**21.** *Aspen Skiing* and *Otter Tail Power* are the principal cases relied upon by Plaintiffs in support of their essential facility argument. Plaintiff also relies on *MCI v. AT & T,* 708 F.2d 1081 (7th Cir.1983), in which the Seventh Circuit upheld a jury's determination that AT & T violated Section 2 by denying MCI interconnection to its local distribution facilities, thereby preventing it from offering certain long distance services. *MCI,* however, was a pre–1996 Act case, and interconnection was not subject to the level or kind of regulation and supervision that it is subject to under the current 1996 Act regime. *See MCI,* 708 F.2d at 1103 ("Although the FCC has authority to compel interconnection ... the initial decision whether to interconnect rests with the utility, and the record shows that the FCC did not control and approve of AT & T's actions here. Nor has the FCC supervised AT & T's interconnection practices so closely that the FCC's approval could be inferred."); *see also* 1A P. Areeda & H. Hovenkamp, *supra,* at ¶ 240(d) (noting that the *MCI* court considered AT & T's failure to interconnect a refusal to deal because it was insufficiently supervised by the regulatory commission); *see also* Defs.' Reply at 14 ("the contrast with the 1996 Act could hardly be sharper—there is no term of an interconnection agreement that an

ILEC can impose on a CLEC for even a moment without a regulator's explicit approval").

**22.** The degree to which a firm's discretion regarding interconnection is supervised by a regulatory regime is critical to application of antitrust principles. *See Otter Tail,* 410 U.S. at 374, 93 S.Ct. 1022 (finding antitrust liability in part because the interstate distribution of power was left to the "voluntary commercial relationships" rather than a "pervasive regulatory scheme" and because these relationships "are governed in the first instance by business judgment and not regulatory coercion."); *see also* 1A P. Areeda & H. Hovenkamp, *supra,* at ¶ 240c(1) ("In determining the appropriateness of antitrust intervention, the issue is ... the impact of regulation on the particular conduct being challenged. Mainly, the antitrust tribunal needs to know whether the conduct (1) is the product of unsupervised discretion of the private firm ... (2) was approved by a regulatory agency but with little thought for the impact of the conduct on competition; ... (3) was approved by a regulatory inquiry that took full, statutorily authorized account of competitive effects ...").

sion of the FCC and to state public utility commissions. Permitting judicial consideration of these same issues may interfere with the ability of state regulatory agencies and the FCC to carry out their regulatory missions, and could subject ILECs to inconsistent standards of conduct. *See Phonetele, Inc. v. AT & T Co.,* 664 F.2d 716, 732 (9th Cir.1981) ("the agency must have sufficient freedom of action to carry out its regulatory mission, and the regulated entity should not be required to act with reference to inconsistent standards of conduct.").

For example, a CLEC could use antitrust law as a vehicle to collaterally challenge adverse determinations of regulators, or bypass regulatory determinations concerning alleged violations of interconnection agreements altogether. In this case, for example, the gravamen of Covad's Complaint is essentially that Bell Atlantic has failed to comply with numerous negotiated interconnection agreements entered into pursuant to the 1996 Act. *See* March 11, 2002, Motions Hearing, Defs.' Handout at 3–4. These very same issues are already before or have already been decided by dozens of state commissions as well as the FCC. Whether an interconnection agreement has been violated is a determination that, as an initial matter at least, must be decided by regulators, and not this Court.

Indeed, the Seventh Circuit in *Goldwasser* emphasized the nature of this incompatibility when dismissing a substantially similar Complaint:

> [T]he procedures established under the 1996 Act for achieving competitive markets [are not] compatible with the procedures that would be used to accomplish

the same result under the antitrust laws ... The elaborate system of negotiated agreements and enforcement established by the 1996 Act could be brushed aside by any unsatisfied party with the simple act of filing an antitrust action. Court orders in those cases could easily conflict with the obligations the state commissions or the FCC imposes.

*Goldwasser,* 222 F.3d at 401. *See also Essential Communications Sys. Inc. v. AT & T,* 610 F.2d 1114, 1120–21 (3rd Cir.1979) (although Communications Act does not confer blanket antitrust immunity, "[w]e recognize ... that a given antitrust remedy might in specific instances present an actual or potential conflict with a duty imposed by the FCC."). Consequently, there is a basic incompatibility between the remedial schemes of the 1996 Act and antitrust law.

In view of all the foregoing, the Court finds that Covad's allegations pertaining to 1996 Act duties do not constitute exclusionary conduct as a matter of antitrust law. Plaintiffs' claims are therefore **dismissed,** and Bell Atlantic's Motion is **granted** as to these claims.

## B. Covad's Retaliatory Patent Claim Must Be Dismissed

■ Covad also alleges that Bell Atlantic's suit against it for patent infringement constitutes a violation of Section 2.[23] Compl. ¶¶ 202–212. Specifically, Covad states that Bell Atlantic's "bad-faith filing of the patent action was a pretext. Bell Atlantic did not bring the patent action out of any desire to protect its purported intellectual property ... [but rather] to interfere with competition in the relevant markets and to retaliate against [it] for as-

---

**23.** In that action, the District Court held on cross motions for summary judgment that Covad did not infringe Bell Atlantic's patent.

*See Bell Atlantic Network Services, Inc. v. Covad Communications Group, et al.,* 92 F.Supp.2d 483 (E.D.Va.2000).

serting its rights in this lawsuit." Compl. ¶ 212.

However, Covad has failed to allege that this suit had any "anticompetitive effect." *Microsoft*, 253 F.3d at 58–59 (prima facie case under Section 2 requires demonstration of "anticompetitive effect"). Therefore, any claim based on the patent suit is **dismissed**, and Defendants' Motion is **granted** as to this claim.

### C. Covad's State Law Claims Must Be Dismissed

Because the Court has dismissed Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over the state law claims. Defendants' motion is therefore **granted** as to Covad's state law claims, and these claims are **dismissed.**

## IV. CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss the Complaint is **granted.** Covad's claims are **dismissed.** An appropriate Order will issue with this Opinion.

### *ORDER*

The matter is now before the Court on Defendants' Motion to Dismiss the Second Amended Complaint. Upon consideration of the Motion, Opposition, Reply, Sur-reply, the numerous submissions of supplemental authority submitted by parties, the Motions Hearing held in this matter on March 11, 2002, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED,** that the Court **grants** Defendants' Motion to Dismiss the Second Amended Complaint; it is further

**ORDERED,** that this case is **dismissed.**